CIRCUIT COURT SUMMONS     NASHVILLE, TENNESSEE

## STATE OF TENNESSEE
## DAVIDSON COUNTY
## 20TH JUDICIAL DISTRICT

☐ First ☐ Alias

2013 JAN 18 PM 3: 43

☐ Pluries

RICHARD R. ROOKER, CLERK

Tennessee Professional Assistance Program

_____

CIVIL ACTION
DOCKET NO _emir_ D.C.

13C090

Plaintiff

**Method of Service:**

☐ Davidson County Sheriff

**Vs.**

☐ Out of County Sheriff

CNA Insurance

☐ Secretary of State

☒ Certified Mail

☐ Personal Service

☐ Commissioner of Insurance

Defendant

$D_1, W_C, E$

**To the above named Defendant:**

You are summoned to appear and defend a civil action filed against you in the Circuit Court 1 Public Square, Room 302, P.O. Box 196303, Nashville, TN 37219-6303, and your defense must be made within thirty (30) days from the date this summons is served upon you. You are further directed to file your defense with the Clerk of the Court and send a copy to the Plaintiff's attorney at the address listed below.

In case of your failure to defend this action by the above date, judgment by default will be rendered against you for the relief demanded in the complaint.

ISSUED: 01·18·13

**RICHARD R. ROOKER**
Circuit Court Clerk
Davidson County, Tennessee

**By:** _____
Deputy Clerk

| ATTORNEY FOR PLAINTIFF | John W. Roberts |
|---|---|
| or | 1720 West End Avenue, Suite 402 |
| PLAINTIFF'S ADDRESS | Address<br>Nashville, TN 37203 |

TO THE SHERIFF:

Please execute this summons and make your return hereon as provided by law.

**RICHARD R. ROOKER**
Circuit Court Clerk

Received this summons for service this _____ day of _____, 20____.

_____
**SHERIFF**

To request an ADA accommodation, please contact Dart Gore at (615) 880-3309.

## RETURN ON PERSONAL SERVICE OF SUMMONS

I hereby certify and return that on the _____ day of _____ , 20_____ , I:

[_____] served this summons and complaint/petition on _____

_____ in the following manner:

_____

[_____] failed to serve this summons within 90 days after its issuance because _____

_____

_____ Sheriff/Process Server

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return, that on the _____ day of _____ , 20 _____ I sent, postage prepaid by

registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in Docket No.

_____ to the defendant, _____ . On the _____ day of

_____ , _____ , I received the return receipt for said registered or certified mail, which had been signed
                            20
by _____ on the _____ day of _____ , 20 _____ . Said return

receipt is attached to this original summons and both documents are being sent herewith to the Circuit Court Clerk for filing.


SWORN TO AND SUBSCRIBED BEFORE ME ON THIS

_____ DAY OF _____ , 20_____ .          _____

                                                                     PLAINTIFF, PLAINTIFF'S ATTORNEY OR OTHER PERSON
                                                                     AUTHORIZED BY STATUTE TO SERVE PROCESS
_____

_____ NOTARY PUBLIC or _____ DEPUTY CLERK

MY COMMISSION EXPIRES: _____


### NOTICE

TO THE DEFENDANT(S):

      Tennessee law provides a ten thousand dollar ($10,000.00) debtor's equity interest
personal property exemption from execution or seizure to satisfy a judgment. If a judgment
should be entered against you in this action and you wish to claim property as exempt, you
must file a written list, under oath, of the items you wish to claim as exempt with the clerk of
the court. The list may be filed at any time and may be changed by you thereafter as necessary;
however, unless it is filed before the judgment becomes final, it will not be effective as to any
execution or garnishment issued prior to the filing of the list. Certain items are automatically
exempt by law and do not need to be listed; these include items of necessary wearing apparel
(clothing) for yourself and your family and trunks or other receptacles necessary to contain such
apparel, family portraits, the family Bible, and school books. Should any of these items be seized,
you would have the right to recover them. If you do not understand your exemption right or how
to exercise it, you may wish to seek the counsel of a lawyer.

ATTACH

RETURN

RECEIPT

HERE

(IF APPLICABLE)


STATE OF TENNESSEE
COUNTY OF DAVIDSON

I, Richard R. Rooker, Clerk of the Circuit Court in the State and County aforesaid,
do hereby certify this to be a true and correct copy of the original summons issued
in this case.

(To be completed only if
copy certification required.)

RICHARD R. ROOKER, CLERK

By: _____ D.C.

IN THE SIXTH CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE
AT NASHVILLE

2013 JAN 18 PH 3: 43

RICHARD J. ROOKER, CLERK

| | | |
|---|---|---|
| TENNESSEE PROFESSIONAL ASSISTANCE PROGRAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 13C240 |
| | ) | |
| CNA Insurance, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT

COMES NOW, the Plaintiff Tennessee Professional Assistance Program, and pursuant to the Tennessee Declaratory Judgment statute T.C.A. § 29-14-101 et seq. would respectfully state as follows:

1.     Tennessee Professional Assistance Program is a non-profit program of the Tennessee Nurses Foundation.

2.     The Defendant CNA is an insurance company authorized to do business within the state of Tennessee, and serves as the insurance provider for the Tennessee Nurses Foundation, and as such is the provider for Tennessee Professional Assistance Program, and is being served in this cause pursuant to the requirements of the Tennessee Declaratory Judgment statute T.C.A. § 29-14-101, et seq., and specifically T.C.A. § 29-14-107.

3.     The Plaintiff Tennessee Professional Assistance Program is a Defendant in a lawsuit filed against the them by Plaintiff Juliette Clifton, such action currently pending in the Circuit Court for Davidson County, Tennessee, docket number 09-C-4165, and a

copy of the Amended Complaint filed by Clifton against Tennessee Professional Assistance Program in said cause are attached hereto and marked as Exhibit "A" to this Complaint.

4.    In the underlying lawsuit filed by defendant Juliette Clifton against the Plaintiff Tennessee Professional Assistance Program under Davidson Circuit docket number 09-C-4165, the defendant Tennessee Professional Assistance Program is being sued for its actions in allegedly causing "extraordinary hardship to Plaintiff and her family" by way of Breach of Contract as well as causing direct harm to her reputation as a nurse.

5.    The Defendant CNA offered a copy of the insurance policy for the Tennessee Nurses Association, bearing policy number 4012323527. A copy of said insurance policy is attached hereto as Exhibit "B" to this Complaint.

6.    The **DEFINITIONS** section of the CNA Policy (policy number 4012323527), in pertinent part, includes the following:

> 4. **"Coverage Territory"** means:
>
> > a.    The United States of America (including its territories and possessions), Puerto Rico and Canada;
>
> 14. **"Personal and advertising injury"** means injury arising out of one or more of the following offenses:
>
> > d.    Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services;
>
> 19. **"Suit"** means a civil proceeding in which damages because of "bodily injury," "property damage," "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

     a.  An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent;

7.  The **COVERAGES** section of the CNA Policy (policy number 4012323527), in pertinent part, includes the following:

### A. COVERAGES

     1a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury," "property damage," or "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.

     B(2)  To "personal and advertising injury" caused by an offense arising out of your business, but only if the offense was committed in the "coverage territory" during the policy period.

8.  The **EXCLUSIONS** section of the CNA Policy (policy number 4012323527), in pertinent part, includes the following:

     p. "Personal and Advertising Injury":

     (1)  Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

     (2)  Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

9.  The Plaintiff Tennessee Professional Assistance Program avers that under the terms and provisions of the CNA Insurance Policy (policy number 4012323527), and including the terms and provisions set forth in paragraphs six through eight of this Complaint that Liability for a suit involving Personal and Advertising Injury is afforded to Tennessee Professional Assistance Program regarding the action filed against plaintiff

by Juliette Clifton in the Circuit Court for Davidson County, Tennessee, under docket

number 09-C-4165.

**WHEREFORE,** the Plaintiff prays:

1. For a judgment declaring that CNA under its policy number 4012323527, provides liability coverage for the Personal and Advertising Injury suit in the Circuit Court case for Davidson County, Tennessee, under docket number 09-C-4165.

2. For such other general relief to which the plaintiff may be entitled.

Respectfully submitted,

by permision

John W. Roberts, BPR 024679 #007766
Attorney for Plaintiff TnPAP
1720 West End Avenue, Ste 402
Nashville, Tennessee 37203
(615) 242-1001

I hereby certify that this is a true copy
of original instrument filed in my office
this 18 day of Jan 20 13
RICHARD R. ROOKER Clerk
By C. Fleming
Deputy Clerk

## CERTIFICATE OF SERVICE

I hereby certify that on this ⟨13⟩ day of January, 2013, a true and exact copy of the foregoing document has been sent to the following via U.S. Mail:

Robins Insurance Agency, Inc.
30 Burton Hlls Blvd #300
Nashville, TN 37215-0000

_____
John W. Roberts

Copy

# EXHIBIT A

FILED
2010 FEB 12 PM 4: 20

RICHARD R. ROOKER, CLERK

CN———D.C.

IN THE CIRCUIT FOR DAVIDSON COUNTY, TENNESSEE
AT NASHVILLE

JULIETTE CLIFTON, )
)
   Plaintiff, )
)
v. )   Civil Action No. C9-C-4165
)
TENNESSEE PROFESSIONAL )
ASSISTANCE PROGRAM, )
 and )
CENTENNIAL MEDICAL CENTER, )
)
   Defendants )

## AMENDED COMPLAINT

     Plaintiff, Juliette Clifton (hereinafter "Plaintiff"), through counsel brings this action for damages against the Tennessee Professional Assistance Program, and Centennial Medical Center, and in support thereof would state the following:

### PARTIES

1. Plaintiff is an adult resident of the State of Tennessee.

2. Based upon information and/or belief, Defendant Tennessee Professional Assistance Program (hereinafter "TnPAP"), is a non-profit program of the Tennessee Nurses Foundation.

3. Based upon information and/or belief, Defendant Centennial Medical Center (hereinafter "Centennial"), is a Tennessee corporation with its principle offices in Davidson County, Tennessee.

### JURISDICTION AND VENUE

4. This action arises out of 42 U.S.C. §12111 et seq., Title I, Americans with Disabilities Act

1



Copy

("ADA"), Tenn. Code Ann. § 8-50-104, the Tennessee Disability Act ("TDA"), Tenn. Code Ann. § 8-8-302, Defamation, and the common law torts of Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, Breach of Contract, and Negligence.

5.   Venue is proper due to the fact that the events giving rise to the claim occurred within this judicial district.

## FACTS AND ALLEGATIONS

6.   This action arises from events which began on February 23, 2009, continuing to the present day.

7.   Plaintiff was employed as a registered nurse at Centennial in Nashville, Davidson County, Tennessee on February 23, 2009, and had been so employed since July, 2008.

8.   Plaintiff had not been subjected to any disciplinary action in her history with Defendant Centennial.

9.   Plaintiff had been under tremendous stress due to her husband's recent surgery at Centennial and resulting complications which resulted in his total and permanent impairment, preventing him from earning a living for their family. As a result, Plaintiff became the sole source of income for their family of seven.

10.  Plaintiff had, in the days prior to the penultimate events, suffered from both an upper respiratory infection and a migraine, for which she was under treatment by her primary care physician.

11.  Plaintiff's superiors at Centennial were aware of her illness, her husband's surgery and complications, and the resulting stress to Plaintiff.

12.  On February 24, 2009, Plaintiff was ill and spoke to a charge nurse on the floor to which

2



she had been assigned that day about the possibility of going home. She was told she could, and she went to speak with her immediate supervisor about doing so.

13. Plaintiff spoke with her assistant-manager, Jenny Harmon ("Harmon") who suggested to Plaintiff that she might benefit from a visit to an Employee Assistance Program (EAP) counselor.

14. Plaintiff agreed and Harmon phoned and helped Plaintiff arrange an appointment for that same morning.

15. Plaintiff went to see the EAP counselor, then went home.

16. On February 25, 2009, Plaintiff reported for work at 7:00 a.m., feeling significantly better, and was performing her regular duties. Shortly after her arrival, Plaintiff came around a corner quickly and said aloud, "Whew, I just got a little dizzy." Recovering immediately, she forgot about the remark and went on about her work. She knew that the medication she had taken for her migraine sometimes caused a slight sense of vertigo.

17. Sometime between 10:00 and 11:00 a.m., 3-4 hours after making the remark, Plaintiff was summoned to the office of Frieda Gardner ("Gardner"), her manager. Plaintiff was told that an unspecified employee had reported that Plaintiff "was dizzy or drunk" to Gardner. Plaintiff was ordered to stop work, and was informed that she was to be given a urine drug screen (UDS) immediately.

18. Plaintiff, despite having disclosed both her physical illness and emotional stress, was given no opportunity to explain the "dizzy" remark, nor was she able to elicit a more specific explanation.

19. Plaintiff was escorted by Gardner, Patricia Knight from Human Resources ("Knight"), Joanne Ettiene, Director of Nursing ("Ettiene"), and Harmon, to a conference room where

3



she was left alone for approximately one hour while waiting for the drug screen technician to arrive. Plaintiff was understandably very emotionally distressed.

20. When the drug screen technician arrived, Plaintiff was escorted by all four Centennial personnel from the conference room to a very public restroom in the administrative lobby of the hospital. Ettiene remarked loudly, "Do you think it is safe for her to be in there by herself? You know she could be in there by tampering with her urine, adding water to it or something." Consequently, the drug screen technician was told to accompany Plaintiff into the restroom to collect the urine sample.

21. Plaintiff had called her husband, who was unable to drive due to his health, who found an acquaintance to pick up Plaintiff and take her home after the UDS.

22. Plaintiff was told by Human Resources that she would be reimbursed for her time off when she returned to work.

23. Plaintiff was also told by Human Resources it would take approximately two (2) days to learn the results of the UDS, and that she would be notified. Plaintiff called the hospital after two days and was told that no results had been reported.

24. On March 2, 2009, the Medical Reporting Officer ("MRO") called Plaintiff at home to discuss the UDS results, and informed her that the UDS would be reported as negative to her employer.

25. On March 3, 2009, Plaintiff reported to the hospital and inquired as to when she would be permitted to return to work. She was told that no UDS results had been reported.

26. Finally, on March 9, 2009, Plaintiff received a call from the Director of Women's Services, Amy Prior ("Prior"), and was informed that the results of the UDS had been received, and that a conference call was to be scheduled.

4

Copy

27. On March 10, 2009, Plaintiff participated in a telephone conference with Gardner, Knight, Ettiene and Prior.

28. Plaintiff was informed, in the telephone conference on March 10, 2009, that she was to "self report" to the Tennessee Professional Assistance Program (TnPAP) within two (2) days. While the employer reluctantly acknowledged that the UDS had returned negative results, they stated that she had been observed as "dizzy" and "erratic," and was "not safe to care for patients."

29. Additionally, Plaintiff was told that her continued employment was conditioned on her report to TnPAP and compliance with their directives, and that she would be terminated and reported to the TN Department of Health, Division of Health Related Boards, Office of Investigations if she did not comply.

30. Plaintiff reported to TnPAP on March 12, 2009, and was informed that she must undergo an evaluation by a psychologist, Dr. Benjamin Fite, PhD. ("Fite"), and that the expense to her would be $400-500.

31. Plaintiff borrowed the money and took the psychologist's test on March 19, 2009. She had a conversation with Fite that lasted between 15 and 20 minutes, and then was given the Minnesota Multiphasic Personality Inventory (MMPI), which took approximately three hours. After the MMPI, Plaintiff left Fite's office without talking with him again.

32. Plaintiff received a report from Fite's office on March 27, 2009, stating that the results of the test were "inconclusive." She was told "either nothing is wrong with you, or you successfully faked the results."

33. Plaintiff repeated the test on March 30, 2009, at the direction of Fite, and at an additional cost of $50. The results showed that she was within normal limits in all areas.

5

34. Fite assessed the Plaintiff on *behavioral* and *personality* issues, without any findings of or concerns expressed about substance abuse. However, he recommended only·"monitoring" by TnPAP.

35. Upon information and belief, TnPAP administers two separate types of "Monitoring Agreements," one for *Behavioral Issues* and one for *Substance Abuse.* Considering Fite's failure to specify the type of monitoring he was recommending, it is unknown why, based on a complete lack of supporting evidence or testimony, TnPAP chose to place client on a *substance abuse* Monitoring Agreement.

36. Plaintiff also made an appointment with Brian Silverthorn, LCSW, at the direction of TnPAP,.for counseling related to her stress and anxiety. Plaintiff first saw Mr. Silverthorn òn April 14, 2009.

37. Mr. Silverthorn assessed Plaintiff's stress to be significantly exacerbated by her inability to earn a living and recommended that she be returned ìo work immediately. He recommended continued counseling for stress, but found no evidence whatsoever of a substance abuse issue. (Letter attached hereto as Exhibit A)

38.. Plaintiff learned.from Fite that Centennial Medical Center had reported falsely to Fite that the results of Plaintiff's UDS had been **positive,** not negative. Once he discovered this error, Fite completely revised his assessment, but still recommended "monitoring" by TnPAP.

39. On April 23, 2009, Plaintiff went to Centennial in an effort to view her personnel file. She was invited into the office of Ellen Cozar, who had Plaintiff's file on her desk. When Plaintiff explained that there was a delay in the TnPAP Monitoring Agreement due to incorrect reporting of her drug screen results, she was asked to leave the facility.

6

40.   Plaintiff was not permitted to view her personnel file.

41.   On May 5, 2009, Plaintiff received the revised Monitoring Agreement from TnPAP, based on Fite's corrected report.

42.   On May 6, 2009, Plaintiff met with her primary care physician, Dr. Lafferty, as requested indicated in Fite's revised report. Her doctor found that she was in good physical health, and wrote a letter stating that she has never exhibited any drug seeking or drug abusing behaviors. He also confirmed that her migraine medication was known to give her slight vertigo. (Attached hereto as Exhibit B)

43.   Plaintiff also provided two additional letters, one from her former primary care physician, and one from the EAP counselor she had seen earlier in February, both of whom denied any observance of drug seeking or substance abuse problems. (Attached hereto as Exhibits C and D)

44.   Plaintiff made repeated requests to Marcia Bradley ("Bradley"), her TnPAP Case Manager, and Mike Harkreader ("Harkreader"), TnPAP Director, asking to be given the opportunity to explain the events from her perspective. She was told repeatedly that she needed to stop denying that she had a problem, but was finally granted a meeting after being admonished that she was "not going to go down there and tell them what to do."

45.   The Monitoring Agreement with TnPAP required her to call in **every day,** and submit (within 2 hours) to an average of fifteen (15) drug screens per year, at her own expense. Further, she was not permitted to apply for any nursing position, nor attend nursing education, without disclosing her "voluntary" participation in the TnPAP program, providing prospective employers or admissions officials with a copy of the Monitoring Agreement (which makes multiple references to "relapses" and "recovery," and refers to

7

treatment by an "addictionologist"), and obtaining subsequent approval from TnPAP.

46. On May 6, 2009, Centennial (Knight) phoned TnPAP and was told that Plaintiff had indicated her intention to sign the Monitoring Agreement. Centennial told TnPAP that they would not hold Plaintiff's job beyond May 8, 2009.

47. On May 7, 2009, Plaintiff finally had her requested meeting with TnPAP, signed the Monitoring Agreement under duress, and delivered a copy to Centennial. (The Monitoring Agreement is attached hereto as Exhibit E)

48. On May 11, 2009, Centennial terminated Plaintiff for non-compliance with TnPAP.

49. Plaintiff filed a charge of ADA discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 11, 2009.

50. Plaintiff's "Right to Sue" has been requested from the EEOC and will be submitted to the Court upon receipt.

51. Plaintiff received no pay from February 25, 2009 until she was able to apply for unemployment compensation in May, 2009. After applying for unemployment, Centennial Medical Center challenged her claim with allegations of "workplace misconduct." These allegations were unsubstantiated and Plaintiff was given approval for unemployment compensation.

52. Plaintiff is unable to support a family of seven with the amount she receives from unemployment. Each month that passes leaves this family more financially devastated.

53. Plaintiff was forced to file bankruptcy in August, 2009, and her family lost their home.

54. An independent Alcohol and Drug assessment of Plaintiff was performed on Thursday, December 3, 2009, by Erin McCullough Voss, LCSW. Her qualifications are outlined in

8

her resume, attached hereto as Exhibit F.[1]

55.   Ms. McCullough Voss's thorough assessment of Plaintiff found, "Based on this Alcohol & Drug Assessment, the client does not appear to have any substance abuse or dependency issues." Further, she indicated that, "Drug screens are not likely to provide valuable data since client is taking medications as prescribed by a physician." Ms. McCullough Voss' full report is attached hereto as Exhibit G.

56.   Ms. McCullough Voss also finds, in concurrence with Mr. Silverthorn, that the appropriate solution to Plaintiff's devastating problems is an immediate return to work.

57.   Plaintiff filed for a Temporary Restraining Order ("TRO") against TnPAP on December 15, 2009, requesting that this Court restrain TnPAP from enforcing the substance abuse Monitoring Agreement. Plaintiff's request for TRO was denied.

58.   Plaintiff subsequently filed a Motion for a Temporary Injunction, for which a hearing was held on February 4, 2010. Plaintiff's Motion for Temporary Injunction was denied by this Honorable Court.

59.   On February 9, 2010, Plaintiff attempted to check in with TnPAP as she is required to do under the Monitoring Agreement, and discovered on TnPAP's website a message that she was not required to check in. Plaintiff phoned Bradley, who referred her to Harkreader, who informed her that TnPAP "would no longer advocate for her." Plaintiff was informed by Harkreader that the contract was cancelled because they could not work together and it was not a good relationship.

60.   Plaintiff was further informed by Harkreader that a report to the Health Related Boards, Bureau of Investigation would be forthcoming.

---

1 Ms. McCullough Vos was properly qualified as an expert, without objection by TnPAP's counsel, at the hearing referenced in paragraph 58 of this complaint.

9

Copy

61.  Plaintiff asked Harkreader what this report would mean with regard to the Board of Nursing and was informed it was out of their [TnPAP's] hands.

62.  Upon information and belief, the report from TnPAP will be the catalyst for an investigation by the Health Related Boards, under whose authority the Board of Nursing is situated, and to whom the investigation of Plaintiff's license will be reported.

63.  Plaintiff received a certified letter from TnPAP on May 9, 2010, which stated she was released from the contract.

## COUNT I
## BREACH OF CONTRACT

64.  Centennial verbally stated to Plaintiff she would not be discharged from employment if she followed specified procedures.

65.  The specified procedures required of Plaintiff by Centennial were that Plaintiff self-report to TnPAP within 48 hours.

66.  Plaintiff was currently employed with Centennial and the promise was that of continued employment under the same terms and conditions.

67.  Centennial communicated the promise of continued employment to Plaintiff and Plaintiff accepted the offer and self reported to TnPAP.

68.  Plaintiff did self-report to TnPAP and was compliant with all imposed recommendations.

69.  Plaintiff was discharged from employment with Centennial.

70.  Plaintiff's discharge was contrary to Centennial's agreement not to terminate if Plaintiff self-reported to TnPAP and complied with their recommendations.

71.  Plaintiff has suffered damages as a result of Centennial's breach of contract.

72.  TnPAP entered into a Monitoring Agreement with Plaintiff.

10

Copy

73. The Monitoring Agreement between TnPAP and Plaintiff was a contract, and was reduced to writing and signed by Plaintiff and a TnPAP representative on May 7, 2009.

74. The contract does not give TnPAP the right to terminate the agreement absent Plaintiff's deviation from the requirements of the contract.

75. Plaintiff did not deviate from the terms of the contract.

76. TnPAP terminated the contract with Plaintiff on February 9, 2010.

77. The termination of the contract with Plaintiff was not for cause.

78. Upon information and belief, upon terminating the contract with Plaintiff, TnPAP made a report to the Health Related Boards regarding Plaintiff's relationship with TnPAP.

79. The contract between TnPAP and Plaintiff gives TnPAP the right to report only non-compliance with the contract to the Health Related Boards.

80. TnPAP has breached the contract with Plaintiff by unilaterally terminating the contract without cause.

81. TnPAP has breached the contract with Plaintiff by reporting information regarding Plaintiff to the Health Related Boards without authority under the contract to do so.

82. Plaintiff has suffered damages as a result of TnPAP's breaches of contract.

### COUNT II
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

83. At the onset of all actions and events contained in this Complaint, Plaintiff was already in a state of moderate to severe emotional distress, and both Defendant's were aware of her emotional state and the circumstances thereof.

11

Copy

84. Centennial engaged in extreme and outrageous conduct by presenting a false and/or unsubstantiated report to TnPAP regarding Plaintiff that would damage her professional reputation.

85. Centennial engaged in extreme and outrageous conduct when they breached the oral contract for continued employment with Plaintiff after requiring her to self-report to TnPAP..

86. Centennial was aware of Plaintiff's contract with TnPAP at the time of her discharge. Centennial, therefore, knew Plaintiff would be required to acknowledge her relationship with TnPAP to all prospective employers.

87. Centennial intended to cause the plaintiff severe emotional distress, or acted with reckless disregard for the probability of causing emotional distress, when Centennial engaged in the aforementioned acts.

88. As a direct and proximate result of Centennial's actions, Plaintiff suffered severe emotional distress.

89. TnPAP engaged in extreme and outrageous conduct when they placed Plaintiff on Monitoring Agreement for substance abuse with no evidence of any substance abuse or addiction.

90. TnPAP engaged in extreme and outrageous conduct when they coerced Plaintiff into signing a contract of adhesion requiring monitoring for substance abuse, with no evidentiary support.

91. TnPAP engaged in extreme and outrageous conduct by giving Plaintiff the ultimatum of signing the Monitoring Agreement for substance abuse or facing a report to the Health Related Boards for violation of the Practice Act.

12

Copy

92. TnPAP engaged in extreme and outrageous conduct by unilaterally terminating the contract with Plaintiff without cause and subsequently making a report of non-compliance to the Health Related Boards after Plaintiff filed a lawsuit.

93. TnPAP intended to cause the plaintiff severe emotional distress, or acted with reckless disregard for the probability of causing emotional distress when taking the aforementioned actions.

94. As a direct and proximate result of TnPAP's actions, Plaintiff suffered severe emotional distress.

## COUNT III
## DEFAMATION

95. TnPAP made a false statement that Plaintiff was abusing prescription medication.

96. TnPAP made a false statement that Plaintiff was impaired at work.

97. These false statements were communicated in the Monitoring Agreement and to Centennial.

98. TnPAP forced Plaintiff to self-publicize the false statement regarding prescription drug abuse by contractually requiring Plaintiff to present the substance abuse Monitoring Agreement, containing the false statement, to all prospective employers and prospective educational institutions.

99. The statement alleging Plaintiff abused prescription drugs was false.

100. The statement alleging Plaintiff was impaired at work was false.

101. TnPAP knowingly or recklessly made the false statements regarding Plaintiff's prescription drug abuse and alleged impairment at work.

102. Plaintiff suffered injury to her reputation as a result of TnPAP's false statements.

103. Plaintiff was unable to obtain employment in her field of nursing as a direct result of

13

TnPAP's false statements and their requirement that Plaintiff present the drug abuse Monitoring Agreement to prospective employers.

104. TnPAP falsely stated Plaintiff was non-compliant with the Monitoring Agreement to Plaintiff's employer, Centennial.

105. The statement regarding non-compliance was false.

106. TnPAP knowingly or recklessly made the statement of Plaintiff's non-compliance to Centennial.

107. Plaintiff was terminated from employment with Centennial based on TnPAP's report of non-compliance with the Monitoring Agreement and/or TnPAP's statement that Plaintiff was abusing prescription medications.

## COUNT IV
## NEGLIGENCE

108. Centennial had a duty to Plaintiff to truthfully report information concerning her and to properly investigate allegations concerning Plaintiff prior to any reporting.

109. Centennial breached that duty when they failed to properly investigate the allegation, and subsequently reported Plaintiff's unsubstantiated, alleged drug use and impairment to TnPAP.

110. Plaintiff suffered damages as a result of Centennials breach of duty.

111. Centennial's actions were the actual and proximate cause of Plaintiff's damages.

112. TnPAP had a duty to Plaintiff to properly assess and correctly ascertain her status and impairments, if any.

113. TnPAP had a duty to Plaintiff to advocate on her behalf and correctly represent her situation to her employer.

14

Copy

114. TnPAP breached these duties when it failed to properly assess Plaintiff's status, incorrectly designated her as a drug abuser and failed to advocate on her behalf.

115. Plaintiff suffered damages as a result of TnPAP's breaches of duty.

116. TnPAP's actions are the actual and proximate cause of Plaintiff's damages.

## COUNT V
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

117. Centennial and TnPAP engaged in the aforementioned negligent acts.

118. Plaintiff suffered serious emotional distress as a result of Defendants negligence.

119. The Defendants' negligent conduct or willful violation of statutory standards was a cause of the serious emotional distress of Plaintiff.

120. Plaintiff's emotional distress caused by the negligence of Defendants was not an abnormal response, but one a reasonable person would have exhibited.

121. Plaintiff suffered emotional distress as a result of Defendants, TnPAP's and Centennial's, actions.

## COUNT VI

## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT ("ADA")

## 42 U.S.C. §12111-12117

122. Plaintiff is an "employee" as defined by 42 U.S.C. §12111(4).

123. Defendant Centennial is an "employer" as defined by 42 U.S.C. §12111(5)(A).

124. Defendant Centennial regarded the Plaintiff as having a substance abuse problem that would "substantially limit" her ability to perform the major life activity of working, and their perceptions were sufficient to prevent them from considering her able to perform any of a broad class of jobs.

15

125. Defendant's violations of Plaintiff's rights were intentional.

126. Defendant's violation of the ADA entitle Plaintiff, pursuant to of 42 U.S.C. §12117, to back pay and benefits, interest on the amount described calculated at the prevailing rate, compensatory damages, punitive damages, attorneys fees and costs, in an amount to be determined at trial.

## COUNT VII
## VIOLATIONS OF THE TENNESSEE DISABILITY ACT ("TDA")
## TENN. CODE ANN. § 8-50-104

127. Defendant Centennial treated the Plaintiff as if the she had an impairment that substantially limited a major life activity.

128. Centennial adopted stereotypical assumptions that were not truly indicative of the Plaintiff's ability to perform her job duties. No showing was made or alleged that Plaintiff's job performance was unsatisfactory.

129. Centennial clearly held the mistaken belief that the employee had a condition or impairment that she did not have; the facts clearly establish that Centennial mistakenly believed her impairment substantially limited her in the major life activity of working; and Centennial mistakenly believed that the employee was unable to perform a broad range of jobs.

130. Defendant's violations of Plaintiff's rights were intentional.

## DEMAND FOR RELIEF

NOW, THEREFORE, for and in consideration of the premises, the Plaintiff prays for and demands the following:

1. That process issue upon the Defendants and they be required to file an answer

16

Copy

within the time period prescribed by law;

2.      Defendant's violation of the ADA entitle Plaintiff, pursuant to of 42 U.S.C. §12117, to back pay and benefits, interest on the amount described calculated at the prevailing rate, compensatory damages, punitive damages, attorneys fees and costs, in an amount to be determined at trial.

3.      That Plaintiff be awarded actual and compensatory damages in an amount not less than $1,000,000.00;

4.      That Plaintiff be awarded punitive damages in an amount to be determined at trial;

5.      That Plaintiff be awarded her reasonable attorney fees and costs incurred in prosecuting action and such discretionary costs as provided under Tennessee State and Federal Law.

6.      That Plaintiff be allowed to assert any and all available claims or defenses before this matter is decided upon the merits.

7.      Provide such further relief as this Honorable Court deems just and proper.

Respectfully Submitted,

Nanette J. Gould (#026330)
Attorney for Plaintiff
2021 Richard Jones Rd., Ste. 350
Nashville, TN 37215
(615) 383-3332
ngould@attorneyngould.com

Michelle Owens, (#026512)
Attorney for Plaintiff
3340 Perimeter Hill Drive
Nashville, TN 37211
(615) 300-8546
michelle.owens@avofirm.com

17



Copy

Copy

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing was served via U.S. mail, postage prepaid on the following:

Tennessee Professional Assistance Program
Director Tom Harkreater
545 Mainstream Drive, Suite 414
Nashville, TN 37228-1219

and

John W. Roberts, #24679
Attorney for Defendant
1105 16th Ave. South, Ste. D
Nashville, TN 37212

Centennial Medical Center
c/o Registered Agent
CT Corporation
800 S. Gay St., Suite 2021
Knoxville, TN 37929

This the 12th day of February, 2010.

Nanette Gould

 **Robins Insurance Agency, Inc.**

Robins Insurance Agency is pleased to provide your new insurance policy. This policy is very important, so please store it in a safe place.

For more than 30 years, Robins Insurance Agency has worked with many of the most respected insurance companies in the country -- all to bring you the most comprehensive insurance services available.

Please call at any time with questions about this policy or your coverage. We appreciate that you have chosen us for your insurance needs and we look forward to helping you in any way possible.

**THANK YOU**

30 Burton Hills Blvd., Suite 300 | Nashville, TN 37215 | phone: 615-665-9200
email: insurance@robinsins.com | www.robinsins.com

**CNA Connect**

Renewal Declaration

| | | |
|---|---|---|
| **POLICY NUMBER**<br>B 4012323527 | **COVERAGE PROVIDED BY**<br>AMERICAN CASUALTY CO OF READING, PA<br>333 S. WABASH<br>CHICAGO, IL. 60604 | **FROM - POLICY PERIOD - TO**<br>10/01/2010    10/01/2011 |

**INSURED NAME AND ADDRESS**
Tennessee Nurses Association and Tennessee Nurses Foundation
545 Mainstream Drive, Ste. 405

NASHVILLE, TN  37228

**AGENCY NUMBER**
976663

**AGENCY NAME AND ADDRESS**
ROBINS INSURANCE AGENCY INC
30 BURTON HILLS BLVD
P. O. BOX 150437
NASHVILLE, TN  37215
Phone Number: (615)665-9200

**BRANCH NUMBER**
390

**BRANCH NAME AND ADDRESS**
NASHVILLE BRANCH
26 CENTURY BLVD, SUI
P. O. BOX 305123
NASHVILLE, TN  37214
Phone Number: (615)886-3300

This policy becomes effective and expires at 12:01 A.M. standard time at your mailing address on the dates shown above.

The Named Insured is an Association.

Your policy is composed of this Declarations, with the attached Common Policy Conditions, Coverage Forms, and Endorsements, if any. The Policy Forms and Endorsement Schedule shows all forms applicable to this policy at the time of policy issuance.

| The Estimated Policy Premium Is | $2,446.00 |
|---|---|
| **Terrorism Risk Insurance Act Premium** | **$48.00** |

Audit Period is Not Auditable

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 27 of 83 PageID #: 32

| POLICY NUMBER | INSURED NAME AND ADDRESS |
|---|---|
| B 4012323527 | Tennessee Nurses Association and Tennessee Nurses Foundation |
| | 545 Mainstream Drive, Ste. 405 |
| | NASHVILLE, TN  37228 |

**PROPERTY COVERAGE**                                                    **LIMIT OF INSURANCE**

The following deductible applies unless a separate deductible is shown on the Schedule of Locations and Coverage.

Deductible:      $500

| | |
|---|---|
| Business Income and Extra Expense Coverage | |
| Business Income and Extra Expense | 12 Months Actual Loss Sustained |
| Business Income and Extra Expense - Dependent Properties | $10,000 |
| Employee Dishonesty | $25,000 |
| Forgery and Alteration | $25,000 |

**LIABILITY COVERAGE**                                                    **LIMIT OF INSURANCE**

| | |
|---|---|
| Each Occurrence Limit | $1,000,000 |
| Medical Expense Limit | $10,000 |
| Personal and Advertising Injury | $1,000,000 |
| Products/Completed Operations Aggregate | $2,000,000 |
| General Aggregate | $2,000,000 |
| Damage To Premises Rented To You | $300,000 |
| Employment Practices/Fiduciary Liability  Retroactive Date:  10/01/2008 | $10,000 |
| EPLI Deductible: $0 | |
| Hired Auto Liability | $1,000,000 |
| Nonowned Auto Liability | $1,000,000 |

)

POLICY NUMBER
B 4012323527

INSURED NAME AND ADDRESS
Tennessee Nurses Association and Tennessee Nurses Foundation
545 Mainstream Drive, Ste. 405
NASHVILLE, TN  37228

## SCHEDULE OF LOCATIONS AND COVERAGE

**LOCATION    1  BUILDING    1**

545 Mainstream Drive, Ste. 405
Nashville, TN    37228

Construction: Masonry Non Combustible

Class Description: Associations - Professional, Not For Profit

   Inflation Guard 3%

| PROPERTY COVERAGE | LIMIT OF INSURANCE |
|---|---|
| Accounts Receivable | $125,000 |
| Business Personal Property | $201,172 |
| Electronic Data Processing | $50,000 |
| Equipment Breakdown | $201,172 |
| Fine Arts | $25,000 |
| Ordinance or Law - Demolition Cost, Increased Cost of Construction | $25,000 |
| Seasonal Increase: 25% | |
| Sewer or Drain Back Up | $25,000 |
| Valuable Papers & Records | $25,000 |

**LOCATION    2  BUILDING    1**

545 Mainstream Drive, Ste. 414
Nashville, TN    37228

Construction: Masonry Non Combustible

Class Description: Associations - Professional, Not For Profit

   Inflation Guard 3%

| PROPERTY COVERAGE | LIMIT OF INSURANCE |
|---|---|
| Accounts Receivable | $125,000 |
| Business Personal Property | $110,779 |
| Electronic Data Processing | $50,000 |
| Equipment Breakdown | $110,779 |
| Fine Arts | $25,000 |
| Ordinance or Law - Demolition Cost, Increased Cost of Construction | $25,000 |
| Seasonal Increase: 25% | |

**POLICY NUMBER**
B 4012323527

**INSURED NAME AND ADDRESS**
Tennessee Nurses Association and Tennessee Nurses Foundation
545 Mainstream Drive, Ste. 405
NASHVILLE, TN 37228

## SCHEDULE OF LOCATIONS AND COVERAGE

| PROPERTY COVERAGE | LIMIT OF INSURANCE |
|---|---|
| Sewer or Drain Back Up | $25,000 |
| Valuable Papers & Records | $25,000 |

**POLICY NUMBER**
B 4012323527

**INSURED NAME AND ADDRESS**
Tennessee Nurses Association and Tennessee Nurses Foundation
545 Mainstream Drive, Ste. 405
NASHVILLE, TN  37228

## LOSS PAYEE SCHEDULE

All loss payees as their interests may appear in the Covered Property.

The following provisions apply in accordance with the insurable interest of the loss payee: Loss Payee

Description of Property: Any Covered Property in which a loss payee, creditor or lender holds an interest, including any person or organization you have entered a contract with for the sale of Covered Property.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 31 of 83 PageID #: 36

| POLICY NUMBER | INSURED NAME AND ADDRESS |
|---|---|
| B 4012323527 | Tennessee Nurses Association and Tennessee Nurses Foundation |
| | 545 Mainstream Drive, Ste. 405 |
| | NASHVILLE, TN  37228 |

## FORMS AND ENDORSEMENTS SCHEDULE

The following list shows the Forms, Schedules and Endorsements by Line of Business that are a part of this policy.

### COMMON

| FORM NUMBER | | FORM TITLE |
|---|---|---|
| SB147037B | 07/2009 | Tennessee Changes |
| SB147075A | 01/2006 | Economic and Trade Sanctions Condition |
| SB147082C | 07/2009 | Businessowners Common Policy Conditions |
| SB147086A | 01/2006 | Loss Payable Provisions |
| SB147088A | 01/2006 | Exclusion - Asbestos |
| SB300161A | 01/2006 | Policy Limitation Disclosure Notice Excl - Silica |

### COMMERCIAL PROPERTY

| FORM NUMBER | | FORM TITLE |
|---|---|---|
| SB146801F | 07/2009 | Businessowners Special Property Coverage Form |
| SB146802C | 01/2008 | Business Income and Extra Expense |
| SB146803A | 01/2006 | Seasonal Increase |
| SB146804A | 01/2006 | Arson and Theft Reward |
| SB146805A | 01/2006 | Claim Data Expense |
| SB146806B | 01/2008 | Debris Removal |
| SB146807B | 07/2009 | Employee Dishonesty |
| SB146808A | 01/2006 | Expediting Expenses |
| SB146809C | 07/2009 | Fine Arts |
| SB146810A | 01/2006 | Fire Department Service Charge |
| SB146811A | 01/2006 | Fire Protective Equipment Discharge |
| SB146812B | 07/2009 | Forgery and Alteration |
| SB146813B | 01/2008 | Newly Acquired or Constructed Property |
| SB146814A | 03/2006 | Ordinance or Law |
| SB146815A | 01/2006 | Outdoor Trees, Shrubs, Plants and Lawns |
| SB146816A | 01/2006 | Pollutant Clean Up and Removal |
| SB146817A | 01/2006 | Preservation of Property |
| SB146818A | 01/2006 | Temporary Relocation of Property |
| SB146819A | 01/2006 | Water Damage, Other Liquids, Solder, Molten Damage |
| SB146820B | 07/2009 | Accounts Receivable |
| SB146821A | 01/2006 | Appurtenant Buildings and Structures |
| SB146822A | 01/2006 | Building Glass |
| SB146823B | 01/2008 | Business Income Extra Expense - Dependent Property |
| SB146824B | 01/2008 | Business Income Extra Expense-Newly Acquired Locs |
| SB146825B | 01/2008 | Business Personal Property Off Premises |
| SB146826B | 01/2008 | Civil Authority |
| SB146827E | 07/2009 | Electronic Data Processing |
| SB146828C | 07/2009 | Equipment Breakdown |
| SB146830B | 01/2008 | Money Orders and Counterfeit Paper Currency |
| SB146831A | 01/2006 | Nonowned Detached Trailers |
| SB146832B | 01/2008 | Ordinance or Law-Increased Period of Restoration |
| SB146833A | 01/2006 | Outdoor Property |
| SB146834A | 01/2006 | Personal Effects |
| SB146835A | 01/2006 | Signs |
| SB146836A | 01/2006 | Spoilage Consequential Loss |
| SB146837A | 01/2006 | Theft Damage to Rented Property |
| SB146838B | 07/2009 | Valuable Papers and Records |
| SB146839D | 01/2008 | Sewer or Drain Back Up |
| SB146936A | 01/2006 | Inflation Guard |
| SB147084B | 07/2009 | Fungi, Wet Rot, Dry Rot and Microbe Exclusion |

INSURED NAME AND ADDRESS
Tennessee Nurses Association and Tennessee Nurses Foundation
545 Mainstream Drive, Ste. 405
NASHVILLE, TN 37228

## FORMS AND ENDORSEMENTS SCHEDULE

### COMMERCIAL PROPERTY

| FORM NUMBER | | FORM TITLE |
|---|---|---|
| SB300129A | 03/2006 | Targeted Hacker Attack |
| SB300146C | 01/2008 | Cap on Losses from Certified Acts of Terrorism |
| SB300179D | 07/2009 | Choice Endorsement |
| SB300456A | 07/2007 | Concurrent Causation, Earth Movmnt, Water Excl Chg |
| SB300596A | 01/2008 | Identity Theft/Recovery Services Endorsement |

### COMMERCIAL GENERAL LIABILITY

| FORM NUMBER | | FORM TITLE |
|---|---|---|
| SB146902C | 01/2008 | Hired Auto and Nonowned Auto Liability |
| SB146932D | 07/2009 | Blanket Additional Insured - Liability Extension |
| SB147079A | 01/2006 | War Liability Exclusion |
| SB147080A | 01/2006 | Exclusion - Silica |
| SB147081A | 01/2006 | Exclusion - Respirable Dust |
| SB147083B | 07/2009 | Fungi Mold Mildew Excl/Water Damage Limitation |
| SB147089A | 01/2006 | Employment - Related Practices Exclusion |
| SB300000B | 01/2007 | Businessowners Liability Coverage Form |
| SB300081C | 01/2008 | Exclusion of Coverage for Special Events |
| SB300185A | 01/2006 | Property Damage Definition Amendatory Endorsement |
| SB300441A | 01/2007 | Fiduciary Liability Coverage Form |
| SB300449A | 01/2007 | Single Limit of Insurance Endorsement |
| SB300450A | 01/2007 | Employment Practices Liability Coverage Form |
| SB300849A | 07/2009 | Recd and Distribution of Material or information |

### *** PLEASE READ THE ENCLOSED IMPORTANT NOTICES CONCERNING YOUR POLICY ***

| FORM NUMBER | | FORM TITLE |
|---|---|---|
| SB146959G | 02/2010 | Policyholders Jurisdictional Inspection |
| SB300144C | 01/2008 | Offer of Terrorism Coverage Notice |
| SB300865A | 07/2009 | Important Information - Policyholder notice |

_Thomas F. McLaurin_
Chairman of the Board

Countersignature

_Jonathan Kenton_
Secretary

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 33 of 83 PageID #: 38

# BUSINESSOWNERS
# SPECIAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the company providing the insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION G – PROPERTY DEFINITIONS, and SECTION H – MALICIOUS CODE, SYSTEM PENETRATION, AND DENIAL OF SERVICE DEFINITIONS.**

## A. COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause Of Loss.

### 1. Covered Property

Covered Property includes Buildings as described under **a.** below, Business Personal Property as described under **b.** below, or both, depending on whether a Limit of Insurance is shown in the Declarations for the type of property. Regardless of whether coverage is shown in the Declarations for Buildings, Business Personal Property, or both, there is no coverage for property described under Paragraph **A.2.** Property Not Covered.

**a. Buildings,** meaning the buildings and structures at the premises described in the Declarations, including:

(1) Completed Additions;

(2) Fences

(3) Fixtures, including outdoor fixtures;

(4) Retaining walls, whether or not attached;

(5) Permanently installed:

    (a) Machinery; and

    (b) Equipment;

(6) Outdoor swimming pools;

(7) Personal Property owned by you that is used to maintain or service the building or structure or the premises, including:

    (a) Fire extinguishing equipment;

    (b) Outdoor furniture;

    (c) Floor coverings;

    (d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

    (e) Lawn maintenance and snow removal equipment; and

    (f) Alarm systems;

(8) If not covered by other insurance:

    (a) Alterations and repairs to the building structure;

    (b) Materials, equipment, supplies and temporary structures, on or within 1,000 feet of the described premises, used for making alterations or repairs to the building or structure.

**b. Business Personal Property** located in or on the buildings at the described premises or in the open (or in a vehicle) within 1,000 feet of the described premises, including;

(1) Property that you own that is used in your business;

(2) Property of others that is in your care, custody or control;

(3) Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

    (a) Made a part of the building or structure you occupy or lease but do not own; and

    (b) You acquired or made at your expense but are not permitted to remove;

(4) Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Paragraph **A.1.b.(2).**;

(5) Your leasehold interest in improvements and betterments which are not damaged or destroyed, but which you lose because your lease is cancelled by the lessor as a result of damage to the building from a

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 34 of 83 PageID #: 39

Covered Cause of Loss. When this occurs, we will calculate the value of your interest in the improvements and betterments as though they had been damaged or destroyed and not repaired or replaced promptly, as provided in the Valuation Loss Condition;

**(6)** Your "money" and "securities";

**(7)** "Stock."

**(8)** Tools and equipment owned by your employees which are used in your business operations.

**2. Property Not Covered**

Covered Property does not include:

**a.** Aircraft;

**b.** Automobiles held for sale;

**c.** Vehicles or self-propelled machines that are:

**(1)** Licensed for use on public roads (subject to motor vehicle registration); or

**(2)** Operated principally away from the described premises;

This paragraph does not apply to:

**(1)** Vehicles or self-propelled machines or autos that you manufacture, process or warehouse;

**(2)** Vehicles or self-propelled machines, other than autos, that you hold for sale; or

**(3)** Trailers or semi-trailers, except as provided in the Non-Owned Detached Trailers Coverage.

**d.** Dams or dikes;

**e.** Contraband, or property in the course of illegal transportation or trade;

**f.** The cost of excavating, grading, backfilling or filling (except those costs necessary due to repair of buildings insured under this Coverage Form from a Covered Cause of Loss), reclaiming or restoring land or water;

**g.** Water or land whether in its natural state or otherwise (including land on which the property is located), land improvements, growing crops or standing timber;

**h.** Outdoor trees, shrubs, plants and lawns, other than "stock" except as provided in the Outdoor Trees, Shrubs, Plants and Lawns Additional Coverage;

**i.** The following property while outside of the buildings:

**(1)** Bridges, walks, roadways, patios or other paved surfaces; or

**(2)** Outdoor radio or television antennas (including satellite dishes) and including their lead-in wiring, masts or towers;

Except as provided in the Outdoor Property Coverage Extension;

**j.** Watercraft (including motors, equipment and accessories) while afloat;

**k.** Accounts and bills, except as provided in the Accounts Receivable Coverage Extension;

**l.** "Valuable Papers and Records," except as provided in the Valuable Papers and Records Coverage Extension;

**m.** Property that is covered under another Coverage Form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

**n.** "Fine Arts," except as provided in the Fine Arts Additional Coverage;

**o.** Bullion, gold, silver, platinum and other precious alloys or metals, unless they are used in your "operations" (theft limitation applies);

**p.** "Electronic data processing equipment" and "Electronic media and data" (not including "stock"), except as provided in the Electronic Data Processing Equipment, Electronic Media and Data and Electronic Data (EDP Coverage Form) Coverage Extension, the Business Income And Extra Expense Coverage Extension, the Accounts Receivable Coverage Extension or the Targeted Hacker Attack Coverage Extension;

Your Business Personal Property coverage is extended to provide excess coverage for loss to the Electronic Data Processing Equipment and Electronic Media and Data (EDP Coverage Form) located only at the described premises and resulting from a covered cause of loss. All exclusions applicable to Business Personal Property apply to this excess coverage. This excess coverage is included in and is not in addition to the limits applicable to your Business Personal Property.

**q.** Outdoor signs, except as provided in the Signs Coverage Extension.

**3. Covered Causes of Loss**

RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 35 of 83 PageID #: 40

a. Excluded in section B. EXCLUSIONS;

b. Limited in paragraph A.4. Limitations; or

c. Excluded or limited by other provisions of this policy.

## 4. Limitations

a. We will not pay for loss of or damage to:

(1) The "interior of any building or structure" or to personal property in the building or structure, caused by rain, snow, sleet or ice whether driven by wind or not, unless:

(a) The building or structure first sustains actual damage to the roof or walls by wind or hail and then we will pay only for the loss to the "interior of the building or structure" or the personal property in the building or structure that is caused by rain, snow, sleet, sand or dust entering the building(s) or structure(s) through openings in the roof or walls made by direct action of wind; or

(b) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

(2) Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gasses or fuel within the furnace of any fired vessel or within the flues or passages through which the gasses of combustion pass.

(3) Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

b. We will not pay for loss of or damage to the following types of property unless caused by any of the "specified causes of loss" or building glass breakage

(1) Live animals, birds or fish, and then only if they are killed or their destruction is made necessary. This limitation does not apply to animals, birds or fish owned by you and held as "stock."

(2) Fragile articles such as glassware, statuary, marbles, chinaware and porcelains, if broken. This limitation does not apply to:

(a) Glass that is part of the exterior or interior of a building or structure;

(b) Containers or property held for sale; or

(c) Photographic or scientific instrument lenses.

c. For loss or damage by theft, the following types of property are covered only up to the limits shown:

(1) $2,500 for furs, fur garments, and garments trimmed with fur.

(2) $5,000 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $500 or less per item.

(3) $25,000 for patterns, dies, molds and forms.

d. We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss if the building where loss or damage occurs has been "vacant" for more than 60 consecutive days before that loss or damage occurs:

(1) Vandalism;

(2) Sprinkler leakage, unless you have protected the system against freezing;

(3) Building glass breakage;

(4) Discharge or leakage of water;

(5) "Theft"; or

(6) Attempted "theft."

With respect to Covered Causes of Loss other than those listed in 4.d.(1) through 4.d.(6) above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

## 5. Additional Coverages

Additional Coverages may be attached to this Policy (designation would appear in the attached form(s)). Unless otherwise stated, payments made under these Additional Coverages are in addition to the applicable Limits of Insurance.

## 6. Coverage Extensions

Coverage forms may be attached to this Policy and designated as Coverage Extensions (such designation would appear in the attached form(s)). Unless otherwise stated, payments made under these Coverage Extensions are subject to and not

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 36 of 83 PageID #: 41

in addition to the applicable Limits of Insurance in this Coverage Form.

## B. EXCLUSIONS

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   **a. Ordinance or Law**

   (1) The enforcement of any ordinance or law:

   (a) Regulating the construction, use or repair of any property; or

   (b) Requiring the tearing down of any property, including the cost of removing its debris.

   (2) This exclusion applies whether the loss results from:

   (a) An ordinance or law that is enforced even if the property has not been damaged; or

   (b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

   **b. Earth Movement**

   (1) Earthquake, including any earth sinking, rising or shifting related to such event;

   (2) Landslide, including any earth sinking, rising or shifting related to such event;

   (3) Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

   (4) Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

   But if Earth Movement, as described in Paragraphs (1) through (4) above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

   (5) Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or

effusion results in fire, building glass breakage or volcanic action, we will pay for the loss or damage caused by that fire, or volcanic action.

Volcanic action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

(a) Airborne volcanic blast or airborne shock waves;

(b) Ash, dust or particulate matter; or

(c) Lava flow.

All volcanic eruptions that occur within any 168 hour period will constitute a single occurrence.

Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss of or damage to Covered Property.

**c. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this policy.

**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**e. Power Failure or Fluctuation**

The failure or fluctuation of power or other utility service supplied to the described premises, however caused, if the cause of the failure or fluctuation occurs away from the described premises.

But if the failure or fluctuation of power or other utility service results in a Covered Cause of Loss, we will pay for the loss or damage caused by that covered cause of Loss.

**f. War And Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by

any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

### g. Water

**(1)** "Flood," surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

**(2)** Mudslide or mudflow;

**(3)** Water or sewage that backs up or overflows from a sewer, drain or sump; or

**(4)** Water under the ground surface pressing on, or flowing or seeping through:

**(a)** Foundations, walls, floors or paved surfaces;

**(b)** Basements, whether paved or not; or

**(c)** Doors, windows or other openings.

But if Water, as described in Paragraphs **(1)** through **(4)**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

### h. Neglect

Neglect of an insured to use reasonable means to save and preserve property from further damage at and after the time of loss.

### i. Collapse of Buildings

Collapse of buildings meaning an abrupt falling down or caving in of a building or any part of a building with the result being that the building or part of a building cannot be occupied for its intended purpose.

**(1)** This exclusion does not apply to collapse of buildings if caused only by one or more of the following:

**(a)** A "specified cause of loss" or breakage of building glass; .

**(b)** Decay, insect or vermin damage that is hidden from view, unless the presence of such decay or insect or vermin damage is known to an insured prior to collapse;

**(c)** Weight of people or personal property;

**(d)** Weight of rain that collects on a roof; or

**(e)** Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of construction, remodeling or renovation; or

**(f)** Use of defective material or methods in construction, remodeling or renovation if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in Paragraphs **(a)** through **(d)** above.

In the event collapse results in a Covered Cause of Loss, we will only pay for the resulting loss or damage by that Covered Cause of Loss.

**(2)** We will not pay for loss of or damage to the following types of property, if otherwise covered in this Coverage Form under Paragraphs **(1)(b)** through **(1)(f)** above, unless the loss or damage is a direct result of the collapse of a building:

**(a)** Awnings, gutters and downspouts;

**(b)** Outdoor radio or television antennas (including microwave or satellite dishes) and their lead-in wiring, masts or towers;

**(c)** Fences;

**(d)** Piers, wharves and docks;

**(e)** Beach or diving platforms or appurtenances;

**(f)** Retaining walls;

**(g)** Walks, roadway and other paved surfaces;

**(h)** Yard fixtures; or

**(i)** Outdoor swimming pools.

**(3)** A building or part of a building that:

**(a)** Is in imminent danger of abruptly falling down or caving in; or

**(b)** Suffers a substantial impairment of structural integrity;

is not considered to have collapsed but is considered to be in a state of imminent collapse.

**(4)** With respect to buildings in a state of imminent collapse, we will not pay for loss or damage unless the state of imminent collapse first manifests itself during the

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 38 of 83 PageID #: 43

policy period and is cause only by one or more of the following which occurs during the policy period:

**(a)** A "specified cause of loss" or breakage of glass

**(b)** Weight of people or personal property;

**(c)** Weight of rain that collects on a roof; or

**(d)** Use of defective material or methods in construction, remodeling or renovation if the state of imminent collapse occurs during the course of construction, remodeling or renovation.

**j.   Malicious Code**

Any "malicious code."

**k.   System Penetration**

Any "system penetration."

**l.   Denial of Service**

Any "denial of service."

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

**a.   Electrical Apparatus**

Artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires.

But if artificially generated electrical current results in fire, we will pay for the loss or damage caused by fire.

**b.   Consequential Loss**

Delay, loss of use or loss of market.

**c.   Smoke, Vapor, Gas**

Smoke, vapor or gas from agricultural smudging or industrial operations.

**d.   Other Types Of Loss**

**(1)** Wear and tear;

**(2)** Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(3)** Smog;

**(4)** Settling, cracking, shrinking or expansion;

**(5)** Nesting or infestation, or discharge or release of waste products or secretions,

by insects, birds, rodents or other animals;

**(6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force.

**(7)** The following causes of loss to personal property:

**(a)** Dampness or dryness of atmosphere;

**(b)** Changes in or extremes of temperature; or

**(c)** Marring or scratching.

**(d)** Changes in flavor, color, texture or finish;

**(e)** Evaporation or leakage; or

**(8)** Contamination by other than "pollutants."

But if an excluded cause of loss that is listed in Paragraphs **(1)** through **(8)** above results in a "specified cause of loss," building glass breakage, or "breakdown" to "covered equipment" (only if otherwise a Covered Cause of Loss), we will pay for the loss or damage caused by that "specified cause of loss," building glass breakage or "breakdown" to "covered equipment" (only if otherwise a Covered Cause of Loss).

**e.   Steam Apparatus**

Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**f.   Seepage**

Continuous or repeated seepage or leakage of water, or the presence of condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

**g.   Frozen Plumbing**

Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 39 of 83 PageID #: 44

**(1)** You do your best to maintain heat in the building or structure; or

**(2)** You drain the equipment and shut off the supply if the heat is not maintained.

**h. Dishonesty**

Dishonest or criminal acts by you, or any of your partners, "members," officers, "managers," "employees" (including leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

**(1)** Acting alone or in collusion with others;

**(2)** Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction to your property, or your "Electronic data processing equipment," "Electronic media and data," and "Electronic data," by your "employees" (including leased employees); but theft by employees (including leased employees) is not covered, except as provided in the Employee Dishonesty Additional Coverage.

**i. False Pretense**

Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**j. Exposed property**

Rain, snow, sand, dust, ice or sleet to personal property in the open, except as provided in the Coverage Extension for Outdoor Property.

**k. Pollution**

Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss." But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss," we will pay for the loss or damage caused by that "specified cause of loss"

**l. Inventory Shortage**

Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property. This exclusion does not apply to "money" and "securities"

**m. Inventory Computation**

Loss of property or that part of any loss, the proof of which as to its existence or amount is dependent on:

**(1)** Any inventory computation; or

**(2)** A profit and loss computation.

**n. Transfer of Property**

The transfer of property to a person or to a place outside the described premises, on the basis of unauthorized instructions.

**o. Accounting Errors**

Loss of "money" or "securities" caused by or resulting from accounting or arithmetic errors or omissions.

**p. Cost of Correction**

The cost of correcting or making good the damage to personal property attributable to such property being processed, manufactured, tested, repaired, restored, retouched or otherwise being worked on.

**3.** We will not pay for loss or damage caused by or resulting from any of the following Paragraphs **a.** through **c.** But if an excluded cause of loss that is listed in Paragraphs **a.** through **c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a. Weather Conditions**

Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **B.1.** above to produce the loss or damage.

**b. Acts or Decisions**

Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c. Negligent Work**

Faulty, inadequate or defective:

**(1)** Planning, zoning, development, surveying, siting;

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction, renovation or remodeling; or

**(4)** Maintenance;

of part or all of any property on or off the described premises.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 40 of 83 PageID #: 45

If an excluded cause of loss that is listed in Paragraphs (1) through (4) above results in a Covered Cause of Loss, we will pay for the resulting loss or damage caused by that Covered Cause of Loss. But we will not pay for:

(1) Any cost of correcting or making good the fault, inadequacy or defect itself, including any cost incurred to tear down, tear out, repair or replace any part of any property to correct the fault, inadequacy or defect; or

(2) Any resulting loss or damage by a Covered Cause of Loss to the property that has the fault, inadequacy or defect until the fault, inadequacy or defect is corrected.

**4. Business Income and Extra Expense Exclusions**

    **a.** We will not pay for:

        (1) Any Extra Expense, or increase of Business Income loss, caused by or resulting from:

            (a) Delay in rebuilding, repairing or replacing the property or resuming "operations," due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

            (b) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations," we will cover such loss that affects your Business Income during the "period of restoration."

    **b.** Any other consequential loss.

**C. Limits of Insurance**

    **1.** Unless otherwise stated, the most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations, Schedules, Coverage Forms, or endorsements.

    **2.** Inflation Guard

        **a.** When a percentage for Inflation Guard is shown in the Declarations, the Limit of Insurance for property to which this coverage applies will automatically increase by that annual percentage.

        **b.** The amount of increase will be:

        (1) The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, multiplied by

        (2) The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 5% is .05), multiplied by

        (3) The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

        Example:

        If:

| | |
|---|---|
| The applicable Building limit is | $100,000 |
| The annual percentage increase is | 5% |
| The number of days since the beginning of the policy year (or last policy change) is | 146 |
| The amount of increase is | |
| $100,000 x .05 x (146/365) = | $2,000 |

**D. DEDUCTIBLES**

    **1.** We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Businessowners Property Coverage Deductible amount shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible up to the applicable Limit of Insurance.

    **2.** Regardless of the amount of the Businessowners Property Coverage Deductible, the most we will deduct from any loss or damage under the Building Glass Coverage Extension in any one occurrence is the Building Glass Deductible shown in the Declarations.

    **3.** The Businessowners Property Coverage Deductible does not apply to any of the following if they are included as part of this policy:

        **a.** Fire Department Service Charge

        **b.** Business Income and Extra Expense

        **c.** Arson and Theft Reward; and

        **d.** Accounts Receivable;

        **e.** Any other property coverage with a specific deductible amount shown in the coverage form or declaration.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 41 of 83 PageID #: 46

**4.** If more than one deductible applies to loss or damage in any one occurrence, we will apply each deductible separately. But the total of all deductible amounts applied in any one occurrence will not exceed the largest applicable deductible.

## E. PROPERTY LOSS CONDITIONS

### 1. Abandonment

There can be no abandonment of any property to us.

### 2. Appraisal

If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### 3. Duties In The Event Of Loss Or Damage

**a.** You must see that the following are done in the event of loss or damage to Covered Property:

**(1)** Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limits of Insurance. However, we will not pay for any loss or damage from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing an analysis, and permit us to make copies from your books and records.

**(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(8)** Cooperate with us in the investigation or settlement of the claim.

**(9)** Resume all or part of your "operations" as quickly as possible.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

### 4. Loss Payment – Building and Personal Property

**a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:

**(1)** Pay the value of lost or damaged property;

**(2)** Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

**(3)** Take all or any part of the property at an agreed or appraised value; or

**(4)** Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of **4.e.** below or any applicable provision which amends or supersedes the value of Covered Property.

**b.** The cost to repair, rebuild or replace does not include the increased cost attributable to

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 42 of 83 PageID #: 47

enforcement of any ordinance or law regulating the construction, use or repair of any property, except as provided in the Ordinance or Law Additional Coverage.

**c.** We will give notice of our intentions within 30 days after we receive the proof of loss.

**d.** We will not pay you more than your financial interest in the Covered Property.

**e.** We will determine the value of Covered Property as follows:

**(1)** At replacement cost (without deduction for depreciation), except as provided in **(2)** through **(18)** below.

**(a)** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage.

**(b)** We will not pay on a replacement cost basis for any loss or damage:

**(i)** Until the lost or damaged property is actually repaired or replaced; and

**(ii)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

With respect to tenants' improvements and betterments, the following also applies:

**a)** If the conditions in **(b)(i)** and **(b)(ii)** Above are not met, the value of tenants' improvements and betterments will be determined as a proportion of your original cost, as set forth under **4e.(7)** below; and

**b)** We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

**c)** We will not pay more for loss or damage on a replacement cost basis than the least of **(i)**, **(ii)**, or **(iii)** Subject to **(d)** below:

**(i)** The Limit of Insurance applicable to the lost or damaged property;

**(ii)** The cost to replace the lost or damaged property with other property:

**a)** Of comparable material and quality; and

**b)** Used for the same purpose; or

**(iii)** The amount actually spent that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost described in **(c)(ii)** Above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

**(d)** The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

**(2)** If the Declarations indicate that Actual Cash Value applies to Buildings or Business Personal Property, paragraph **(1)** above does not apply to the property for which Actual Cash Value is indicated.

**(3)** Property of others at the amount you are liable plus the cost of labor, materials, or services furnished or arranged by you on personal property of others, not to exceed the replacement cost.

**(4)** The following property at actual cash value:

**(a)** Used or second-hand merchandise held in storage or for sale;

**(b)** Household furnishings;

**(c)** Personal effects.

**(5)** "Fine Arts" as follows:

**(a)** If there is a schedule of "fine arts" on file which includes a description and value of the lost or damaged item, we will pay the value as stated in the schedule for that item if there is a total loss to that item. If there is a partial loss to an item, we will pay the cost of reasonably restoring or repairing that item.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 43 of 83 PageID #: 48

(b) For "fine arts" without a schedule on file as described in paragraph (a) above, the value of "fine arts" will be the least of the following amounts:

   (i) Market value of the lost or damaged item at the time and place of loss;

   (ii) The cost of reasonably restoring the lost or damaged item; or

   (iii) The cost of replacing that lost or damaged item with property substantially the same.

(6) Glass at the cost of replacement with safety glazing material if required by law.

(7) Tenants' Improvements and Betterments at:

   (a) Replacement cost if you make repairs promptly.

   (b) A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

      (i) Multiply the original cost by the number of days from the loss or damage to the expiration date of the lease; and

      (ii) Divide the amount determined in (i) above by the number of days from the installation of improvements to the expiration of the lease.

    If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

   (c) Nothing, if others pay for repairs or replacement.

(8) "Valuable Papers and Records" at the cost of restoration or replacement. To the extent that the contents of the "valuable papers and records" are not restored or replaced, the "valuable papers and records" will be valued at the cost of replacement with blank material of substantially identical type.

(9) "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

(10) Property in transit (other than "stock" you have sold) at the amount of invoice, including your prepaid or advanced freight

charges and other charges which may have accrued or become legally due from you since the shipment. If you have no invoice, the actual cash value will apply.

(11) "Money" at its face value.

(12) "Securities" at their value at the close of business on the day the loss is discovered.

(13) Accounts Receivable as follows:

   (a) If you cannot accurately establish the amount of Accounts Receivable outstanding as of the time of loss, we will:

      (i) Determine the total of the average monthly amounts of Accounts Receivable for the 12 months immediately preceding the month in which the loss occurs; and

      (ii) Adjust that total for any normal fluctuations in the amount for Accounts Receivable for the month in which the loss occurred or for any demonstrated variance from the average for that month.

   (b) If you can accurately establish the amount of Accounts Receivable outstanding, that amount will be used in the determination of loss.

   (c) The following will be deducted from the total amount of Accounts Receivable, however that amount is established:

      (i) The amount of the accounts for which there was no loss;

      (ii) The amount of the accounts that you are able to reestablish or collect;

      (iii) An amount to allow for probable bad debts that you are normally unable to collect; and

      (iv) All unearned interest and service charges.

(14) "Electronic Data Processing Equipment" at replacement cost as of the time and place of loss, without deduction for physical deterioration, depreciation, obsolescence or depletion. However, in the event of replacement of "electronic data processing equipment" with identical property is impossible, the replacement cost will be the cost of items that are

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 44 of 83 PageID #: 49

similar to the damaged or destroyed equipment and intended to perform the same function, but which may include technological advances.

"Electronic data processing equipment" that is obsolete or no longer used by you will be valued at actual cash value.

**(15)** "Electronic Media and Data" at the cost of the same or similar blank media.

**(16)** "Electronic Data":

  **(a)** For which duplicates or back-ups do not exist, will be valued at your cost to research, replace or restore the "electronic data," but only if the "electronic data" is actually replaced or restored.

  **(b)** For which full duplicates or back-ups exist, will be valued at your cost of labor to copy the "electronic data" from such duplicates or back-ups, but only if the "electronic data" is actually copied.

  **(c)** For which partial duplicates or back-ups exist, will be valued at your cost of labor to copy the partial "electronic data" from such duplicates or back-ups, and your cost to research, replace or restore the remaining "electronic data," but only if the "electronic data" is actually copied and replaced or restored.

  **(d)** In the event that you are not able to copy "electronic data" from back-ups, or replace or restore, "electronic data" will be valued at your cost of labor up to the point in time that you reach that determination.

**(17)** The value of United States Government Internal Revenue taxes and custom duties and refundable state and local taxes paid or fully determined on the following property held for sale will not be considered in determining the value of Covered Property:

  **(a)** Distilled spirits;

  **(b)** Wines;

  **(c)** Rectified products; or

  **(d)** Beer.

**(18)** Lottery tickets at their initial cost to you except for winning tickets at their redeemed value.

**f.** Our payment for loss of or damage to personal property of others will only be for the account of the owners of the property. We may adjust losses with the owners of lost or damaged property, if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**g.** We may elect to defend you against *suits* arising from claims of owners of property. We will do so at our expense.

**h.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss provided you have complied with all of the terms of this policy; and

  **(1)** We have reached agreement with you on the amount of loss; or

  **(2)** An appraisal award has been made.

**i.** At our option, we may make a partial payment toward any claims, subject to the policy provisions and our normal adjustment process. To be considered for partial claim payment, you must submit a partial sworn proof of loss with supporting documentation. Any applicable policy deductibles must be satisfied before any partial payments are made.

**j.** Pair, Sets or Parts

  **1.** Pair or Set. In case of "loss" to any part of a pair or set we may:

    **(a)** Repair or replace any part to restore the pair or set to its value before the "loss"; or

    **(b)** Pay the difference between the value of the pair or set before and after the "loss."

  **2.** Parts. In case of "loss" to any part of Covered Property consisting of several parts when complete, we will only pay for the value of the lost or damaged part.

**5. Loss Payment – Business Income and Extra Expense**

  **a.** If the Declarations indicate that Business Income and Extra Expense applies to Buildings or Business Personal Property, the amount of Business Income loss will be determined based on:

    **(1)** The Net Income of the business before the direct physical loss or damage occurred;

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 45 of 83 PageID #: 50

(2) The likely Net Income of the business if no physical loss or damage occurred, but not including any likely increase in Net Income attributable to an increase in the volume of business as a result if favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

(3) The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

(4) Other relevant sources of information, including:

    (a) Your financial records and accounting procedures;

    (b) Bills, invoices and other vouchers; and

    (c) Deeds, liens or contracts.

**b.** The amount of Extra Expense will be determined based on:

(1) All reasonable and necessary expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

    (a) The salvage value that remains of any property bought for temporary use during the "period of restoration," once "operations" are resumed; and

    (b) Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

(2) All reasonable and necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

**6.** We will reduce the amount of your:

(1) Business Income loss, other than Extra Expense, to the extent you can resume your "operations," in whole or in part, by using damaged or undamaged property (including merchandise or "stock") at the described premises or elsewhere; or

(2) Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

**7.** If you do not resume "operations," or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

**8.** We will pay for covered loss or damage within 30 days after we receive your sworn proof of loss provided you have complied with all of the terms of this policy; and

(1) We have reached agreement with you on the amount of loss; or

(2) An appraisal award has been made.

**9. Vacancy**

  **a. Description of Terms**

(1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in Paragraphs (a) and (b) below:

    (a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

    (b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

      **i.** Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

      **ii.** Used by the building owner to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

  **b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

    (a) Vandalism;

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 46 of 83 PageID #: 51

**(b)** Sprinkler leakage, unless you have protected the system against freezing;

**(c)** Building glass breakage;

**(d)** Water damage;

**(e)** Theft; or

**(f)** Attempted theft.

With respect to Covered Causes of Loss other than those listed in paragraphs **(1)(a)** through **(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

### 10. Recovered Property

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, you may retain the property. But then you must return to us the amount we paid to you for the property. We will pay the recovery expenses and the expenses to repair the recovered property, subject to the applicable Limit of Insurance.

### 11. Noncumulative Limit

No Limit of Insurance cumulates from policy period to policy period.

## F. COMMERCIAL PROPERTY CONDITIONS

### 1. Concealment, Misrepresentation or Fraud

This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other Insured, at any time, intentionally conceal or misrepresent a material fact concerning:

**a.** This policy;

**b.** The Covered Property;

**c.** Your interest in the Covered Property; or

**d.** A claim under this policy.

### 2. Control of Property

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Form at any one or more premises will not affect coverage at any premises where, at the time of loss or damage, the breach of condition does not exist.

### 3. Insurance Under Two or More Coverages

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

### 4. Legal Action Against Us

No one may bring a legal action against us under this Coverage Form unless:

**a.** There has been full compliance with all of the terms of this Coverage Form; and

**b.** The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

### 5. Liberalization

If we adopt any revision that would broaden the coverage under this policy without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

### 6. No Benefit to Bailee

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

### 7. Other Insurance

**a.** You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Form. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Form bears to the Limits of Insurance of all insurance covering on the same basis.

**b.** If you have other insurance covering the same loss or damage, other than that described in Paragraph a. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

### 8. Policy Period, Coverage Territory

Under this Coverage Form:

**a.** We cover loss or damage you sustain through acts committed or events occurring:

**(1)** During the policy period shown in the Declarations; and

**(2)** Within the coverage territory; and

**b.** The coverage territory is:

**(1)** The United States of America (including its territories and possessions);

**(2)** Puerto Rico; and

**(3)** Canada

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 47 of 83 PageID #: 52

**9. Transfer of Rights of Recovery Against Others To Us**

Applicable to the Businessowners Property coverage:

If any person or organization to or for whom we make payment under this policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing.

a. Prior to a loss to your Covered Property or Covered Income; or

b. After a loss to your Covered Property only if, at the time of loss, that party is one of the following:

   (1) Someone insured by this insurance;

   (2) A business firm:

      (a) Owned or controlled by you; or

      (b) That owns or controls you; or

   (3) Your tenant.

   This will not restrict your insurance.

**10. Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

a. We will not pay the full amount of any loss if the value of Covered Property at the time of loss multiplied by the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property

Instead, we will determine the most we will pay using the following steps:

   (1) Multiply the value of Covered Property at the time of loss by the Coinsurance Percentage;

   (2) Divide the Limit of Insurance of the property by the figure determined in step (1);

   (3) Multiply the total amount of the covered loss, before the application of any deductible, by the figure determined in step (2) above; and

   (4) Subtract the deductible from the figure determined in step (3)

We will pay the amount determined in step (4) or the limit of insurance, whichever is less.

For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**Example No. 1 (Under Insurance):**

When:

| | |
|---|---|
| The value of the property is | $250,000 |
| The coinsurance percent for it is | 90% |
| The Limit of Insurance for it is | $112,500 |
| The Deductible is | $250 |
| The amount of loss is | $40,000 |

Step (1): $250,000 x 90% = $225,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step (2): $112,500/$225,000 = .50

Step (3): $40,000 x .50 = $20,000

Step (4): $20,000 - $250 = $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

**Example No. 2 (Adequate Insurance):**

When:

| | |
|---|---|
| The value of the property is | $250,000 |
| The Coinsurance percentage for it is | 90% |
| The Limit of Insurance for it is | $225,000 |
| The Deductible is | $250 |
| The amount of loss is | $40,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $225,000 ($250,000 x 90%).

Therefore, the Limit of Insurance in this Example is adequate and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

b. Coinsurance does not apply to:

   (1) "Money" and "securities";

   (2) Additional Coverages;

   (3) Coverage Extensions; or

   (4) Loss or damage in any one occurrence totaling less than $2,500.

**11. Mortgageholders**

a. The term, mortgageholder, includes trustee.

Case 3:13-cv-00241  Document 1-1  Filed 03/18/13  Page 48 of 83 PageID #: 53

**b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

**c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

**d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Form, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

    **(1)** Pays any premium due under this Coverage Form at our request if you have failed to do so;

    **(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

    **(3)** Has notified us of any change in ownership or occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this Coverage Form will then apply directly to the mortgageholder.

**e.** If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Form:

    **(1)** The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

    **(2)** The mortgageholder's rights to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

**f.** If we cancel this policy we will give written notice to the mortgageholder at least: .

    **(1)** 10 days before the effective date of cancellation if we cancel for your non-payment of premium; or

    **(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**g.** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

**G. PROPERTY DEFINITIONS**

**1.** "Banking Premises" means the interior of that portion of any building which is occupied by a banking institution or similar safe depository.

**2.** "Breakdown"

  **a.** Means:

    **(1)** Failure of pressure or vacuum equipment;

    **(2)** Mechanical failure, including rupture or bursting caused by centrifugal force; or

    **(3)** Electrical failure including arcing;

    That causes physical damage to "covered equipment" and necessitates its repair or replacement; and

  **b.** Does not mean:

    **(1)** Malfunction, including but not limited to adjustment, alignment, calibration, cleaning or modification;

    **(2)** Leakage at any valve, fitting, shaft seal, gland packing, joint or connection;

    **(3)** Damage to any vacuum tube, gas tube, or brush;

    **(4)** Damage to any structure or foundation supporting the "covered equipment" or any of its parts;

    **(5)** Damage

**3.** "Communication Supply Services"

  **a.** Means property supplying communication services, including telephone, radio, microwave or television services to the described premises, such as:

    **(1)** Communication transmission lines, including fiber optic transmission lines;

    **(2)** Coaxial cables; and

    **(3)** Microwave radio relays, except satellites and;

  **b.** Does not mean overhead transmission lines.

**4.** "Covered Equipment"

  **a.** Means the following types of equipment:

    **(1)** Equipment designed and built to operate under internal pressure or vacuum other than weight of contents;

    **(2)** Electrical or mechanical equipment that is used in the generation, transmission or utilization of energy;

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 49 of 83 PageID #: 54

(3) Refrigeration or Air Conditioning systems;

(4) Fiber optic cable; and

(5) Hoists and cranes;

b. Does not mean any

(1) "Electronic data processing equipment";

(2) "Electronic media and data" or "electronic data";

(3) Part of pressure or vacuum equipment that is not under internal pressure of its contents or internal vacuum;

(4) Insulating or refractory material;

(5) Pressure vessels and piping that are buried below ground and require the excavation of materials to inspect, remove, repair, or replace;

(6) Structure, foundation, cabinet or compartment supporting or containing the "covered equipment" or part of the "covered equipment" including pen-stock, draft tube or well casing;

(7) Vehicle, aircraft, self-propelled equipment or floating vessel, including any equipment mounted on or used solely with any vehicle, aircraft, self-propelled equipment or floating vessel;

(8) Elevator or escalator, but not excluding any electrical machine or apparatus mounted on or used with this equipment; or

(9) Equipment or any part of such equipment manufactured by you for sale.

5. **"Diagnostic Equipment"** means any:

a. Equipment; or

b. Apparatus;

used solely for research, diagnostic, medical, surgical, therapeutic, dental or pathological purposes.

6. **"Electronic Data"**

a. Means information reduced to an electronic format for processing with and storage in "electronic data processing equipment," software and programming records and instructions used for "electronic data processing equipment."

b. Any reference to your "electronic data" means "electronic data" owned or licensed by you and stored on your "electronic data processing equipment."

c. Does not mean "valuable papers and records."

7. **"Electronic Media and Data"**

a. Means physical media on which "electronic data" is stored, and the "electronic data" stored thereon, including without limitation, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other repositories used with electronically controlled equipment.

b. Any reference to your "electronic media and data" means "electronic media and data" owned by you and stored on your "electronic data processing equipment."

c. "Electronic media and data" does not mean any "valuable papers & records."

8. **"Electronic Data Processing Equipment"**

a. Means any of the following equipment:

(1) Computers, facsimile machines, word processors, multi-functional telephones and computer servers, and

(2) Any component parts and peripherals of such equipment, including related surge protection devices.

(3) Laptops and personal digital assistants.

b. "Electronic data processing equipment" does not mean equipment used to operate production type of:

(1) Machinery; or

(2) Equipment.

c. Any reference to your "electronic data processing equipment" means "electronic data processing equipment" used in your "operations" and controlled and operated by you, and includes any "electronic data processing equipment" controlled or operated by a third party on your behalf.

9. **"Employee(s)"** means:

a. Any natural person:

(1) While in your service (and for 30 days after termination of service); and

(2) Whom you compensate directly by salary, wages or commissions; and

(3) Whom you have the right to direct and control while performing services for you.

b. Any natural person employed by an employment contractor while that person is subject to your direction and control and performing services for you excluding,

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 50 of 83 PageID #: 55

however, any such person while having care and custody of property outside the premises.

c. Your directors or trustees while acting as a member of any of your elected or appointed committees to perform on your behalf specific, as distinguished from general, directorial acts.

But "employee" does not mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character.

10. **"Employee Dishonesty"** means only dishonest acts, committed by an "employee," whether identified or not, acting alone or in collusion with other persons, except you, a partner, a "member" or a "manager," including the "theft" of Personal Property of Others in your care custody or control by an "employee," with the manifest intent to:

a. Cause you to sustain loss; and also

b. Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment) for:

(1) The "employee"; or

(2) Any person or organization intended by the "employee" to receive that benefit.

11. **"Fine Arts"**

a. Means paintings, etchings, pictures, tapestries, art glass windows, valuable rugs, statuary, marbles, bronzes, antique furniture, rare books, antique silver, porcelains, rare glass, bric-a-brac, and similar property with historical value, or artistic merit; and

b. Does not mean any glass that is a part of a building or structure.

12. **"Flood"** means a general and temporary condition of partial or complete inundation of normally dry land areas, whether caused by natural occurrences, acts or omissions of man or any other cause or combination of causes.

All flooding in a continuous or protracted event will constitute a single "flood."

13. **"Forgery"** means the signing of the name of another person or organization with intent to deceive. "Forgery" does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity for any purpose.

14. **"Interior of any building or structure"** as used in this policy means all portions of the structure that are within the exterior skin of the structure's walls

and roof, including, but not limited to lathe, sand paper, framing, wallboard and tarpaper.

15. **"Maintenance Fees"** means the regular payment made to you by unit-owners and used to service the common property.

16. **"Manager"** means a person serving in a directorial capacity for a limited liability company.

17. **"Member"** means an owner of a limited liability company represented by its membership interest, who also may serve as a "manager."

18. **"Money"** means currency and coins in current use, bank notes, travelers checks, register checks and money orders held for sale to the public.

19. **"Operations"** means the type of your business activities occurring at the described premises and tenantability of the described premises.

20. **"Period of restoration"** means the period of time that:

a. Begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and

b. Ends on the earlier of:

(1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

(2) The date when business is resumed at a new permanent location.

"Period of restoration" does not include any increased period required due to the enforcement of any law that:

(a) Regulates the construction, use or repair, or requires the tearing down of any property; or

(b) Regulates the prevention, control, repair, clean-up or restoration of environmental damage.

The expiration date of this policy will not cut short the "period of restoration."

21. **"Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste, and any unhealthful or hazardous building materials (including but not limited to asbestos and lead products or materials containing lead.). Waste includes materials to be recycled, reconditioned or reclaimed.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 51 of 83 PageID #: 56

22. **"Power Generating Equipment"**

   a. Means the following types of equipment or apparatus:

      (1) Pressure;

      (2) Mechanical; or

      (3) Electrical;

      Used in or associated with the generation of electrical power; and

   b. Does not mean such equipment that is used solely to generate emergency power that is less than or equal to 1000KW.

23. **"Power Supply Services"**

   a. Means the following types of property supplying electricity, steam or gas to the described premises:

      (1) Utility generating plants;

      (2) Switching stations;

      (3) Substations;

      (4) Transformers; and

      (5) Transmission Lines; and

   b. Does not mean overhead transmission lines.

24. **"Production Equipment"**

   a. Means any:

      (1) Production machinery; or

      (2) Process machinery that processes, shapes, forms or grinds:

         i. Raw materials;

         ii. Materials in process; or

         iii. Finished products; and

   b. Includes "covered equipment" that is used solely with or forms an integral part of the:

      (1) Production;

      (2) Process; or

      (3) Apparatus.

25. **"Rental Value"** means Business Income that consist of:

   a. Net income (Net Profit or Loss before income taxes) that would have been earned or incurred as rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, including the fair rental value of any portion of the described premises which is occupied by you; and

   b. Continuing normal operating expenses incurred in connection with that premises, including:

      (1) Payroll; and

      (2) The amount of charges which are the legal obligation of the tenant(s) but would otherwise be your obligations.

26. **"Securities"** means negotiable and nonnegotiable instruments or contracts representing either "money" or other property and includes:

   a. Tokens, tickets except lottery tickets, revenue and other non-postage stamps whether or not in current use; and

   b. Evidences of debt issued in connection with credit or charge cards, which are not of your own issue;

   but does not include "money." Lottery tickets held for sale are not securities.

27. **"Specified causes of loss"** means the following:

   Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

   a. Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

      (1) The cost of filling sinkholes; or

      (2) Sinking or collapse of land into man-made underground cavities.

   b. Falling objects does not include loss of or damage to:

      (1) Personal Property in the open; or

      (2) The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

   c. Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam.

28. **"Stock"** means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 52 of 83 PageID #: 57

**29. "Suspension"** means:

    **a.** The partial or complete cessation of your business activities; or

    **b.** That a part or all of the described premises is rendered untenantable.

**30. "Theft"** means any act of stealing.

**31. "Vacant"** means the following

    **a.** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operation.

    **b.** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

        **(1)** Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

        **(2)** Used by the building owner to conduct customary operations.

**32. "Valuable papers and records"** means inscribed, printed or written:

    **a.** Documents;

    **b.** Manuscripts; and

    **c.** Records;

Including abstracts, books, deeds, drawings, films, maps or mortgages.

But "valuable papers and records" does not mean:

    **a.** "Money" or securities";

    **b.** "Electronic data";

    **c.** "Electronic media and data";

**33. "Water Supply Services"** means the following types of property supplying water to the described premises:

    **a.** Pumping stations; and

    **b.** Water mains.

## H. MALICIOUS CODE, SYSTEM PENETRATION AND DENIAL OF SERVICE DEFINITIONS:

**1. "Denial of Service"** means any failure or inability of any person, user, customer, "electronic data processing equipment," computer system or computer network to communicate with, gain access to, or use, any "electronic data processing equipment," computer system, computer network, "electronic media and data" or "electronic data" because an excessive volume of data, requests or communications is sent to, received by or processed by such "electronic data processing equipment," computer system or computer network, and depletes the bandwidth, capacity or computational resources thereof, including without limitation, any business interruption caused by the foregoing.

**2. "Electronic Data Peril"** means:

    **a.** Corruption, unauthorized use, distortion, deletion, damage, destruction or any other harm to, or misappropriation or copying of, "electronic data" or information;

    **b.** Interruption, delay, disruption, suspension, loss of functionality of, inaccessibility to, unauthorized access to or inability to use or communicate with, "electronic data processing equipment," "electronic media and data," "electronic data," computer resources, electronic devices, computer system, computer network or equipment; or

    **c.** Misappropriation, transfer or copying of any property, "money," "securities" or "stock," including without limitation, the use of any computer to cause such misappropriation, transfer or copying;

**3. "Malicious Code"** means any data, computer program, software, firmware or computer code designed to cause or result in, or that does cause or result in (whether designed to do so or not), any "electronic data peril," including without limitation, computer viruses, worms or Trojan horses.

**4. "Mass Attack Malware"** means any "malicious code":

    **a.** Capable of replicating or mutating;

    **b.** Propagating, spreading or moving to other "electronic data processing equipment," "electronic media and data," "electronic data," electronic devices, media, computer systems, equipment or computer networks, including without limitation, by attaching to applications, e-mails, e-mail attachments or otherwise;

    **c.** Designed to exploit a vulnerability that is common to or present on more than one "electronic data processing equipment," "electronic media and data," "electronic data," electronic devices, media, computer systems, equipment or computer networks; or

    **d.** That infects, is stored upon, exists within or resides on more than one "electronic data processing equipment," "electronic media and data," "electronic data," electronic device,

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 53 of 83 PageID #: 58

media, computer system, equipment or computer network.

5. **"Mass System Penetration"** means any "system penetration" that:

   a. Exploits, or is designed to exploit, a vulnerability that is common to or present on more than one "electronic data processing equipment," "electronic media and data," "electronic data," electronic devices, media, computer systems, equipment or computer networks; or

   b. Targets or exploits more than one "electronic data processing equipment," "electronic media and data," "electronic data," electronic device, media, computer system, equipment or computer network.

6. **"System Penetration"** means any access to or use of any "electronic data processing equipment," "electronic media and data," "electronic data," electronic device, computer system, equipment or computer network intended to cause or result in, or that does cause or result in, any "electronic data peril," which is not directly or indirectly enabled by "malicious code" and which is achieved by a person without the use or assistance, directly or indirectly, of "malicious code."

7. **"Targeted Hacker Attack"** means the corruption, distortion, damaging, deletion or destruction of your "electronic data" resulting from "targeted system penetration" or "targeted malware."

8. **"Targeted Malware"** means any "malicious code" that:

   a. Is intended by a hacker to specifically infect, or be stored or reside on, only your "electronic data processing equipment";

   b. Is incapable of replicating, mutating, propagating, spreading or moving to other "electronic data processing equipment," "electronic media and data," "electronic data," electronic devices, media, computer systems or computer networks;

   c. Does not infect or reside on any other "electronic data processing equipment," "electronic media and data," "electronic data," computer system, electronic device, or computer network that is not yours; and

   d. Exploits a vulnerability that is unique to, and present on, only your "electronic data processing equipment," and such vulnerability is not common to or present on any other "electronic data processing equipment," computer, electronic device, medium, computer system, equipment or computer network.

9. **"Targeted System Penetration"** means "system penetration" that is designed to target and exploit, and that does target and exploit, a vulnerability that is unique to, and present on, only your "electronic data processing equipment," and such vulnerability is not common to or present on any other "electronic data processing equipment," computer, electronic device, medium, computer system, equipment or computer network.

Case 3:13-cv-00241 Document 1-1 Filed 03/18/13 Page 54 of 83 PageID #: 59


**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SEASONAL INCREASE

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form:

Subject to the Exclusions, Conditions and Limitations of this policy, you may extend this insurance as indicated below.

Unless otherwise stated, payments made under the following coverage will not increase the applicable Limits of Insurance.

1. The Limit of Insurance for Business Personal Property shown in the Declarations will automatically increase by 25%, or the amount shown in the Declarations to provide for seasonal variations.

2. This increase will apply only if the Limit of Insurance shown for Business Personal Property in the Declarations is at least 100% of your average monthly values during the lesser of:

   a. The 12 months immediately preceding the date of the loss or damage occurs; or

   b. The period of time you have been in business at the location where the loss or damage occurs, on the date the loss or damage occurs.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 55 of 83 PageID #: 60

# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ·ARSON & THEFT REWARD

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Section **A.5. Additional Coverages.**

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limits of Insurance.

**Arson and Theft Reward**

1. We will pay for reasonable expenses you incur for rewards that lead to:

    a. An arson conviction in connection with a covered fire or explosion loss; or

    b. A "theft" conviction in connection with a covered "theft" loss.

2. The most we will pay under this Additional Coverage in connection with a particular loss is $5,000.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 56 of 83 PageID #: 61


**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CLAIM DATA EXPENSE

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage under Section **A.5. Additional Coverages:**

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limit of Insurance.

Claim Data Expense

1. We will pay the reasonable expenses you incur in preparing claim data when we require such data to show the extent of loss. This includes the cost of taking inventories, making appraisals, preparing income statements, and preparing other documentation.

2. Under this Additional Coverage, we will not pay for:

   a. Any expenses incurred, directed or billed by or payable to attorneys, insurance adjusters or their associates or subsidiaries;

   b. Any costs in connection with Paragraph **E.2.** Appraisal; or

   c. Any expenses incurred, directed, or billed by or payable to insurance brokers or agents, or their associates or subsidiaries, without our written consent prior to such expenses being incurred.

3. The most we will pay for preparation of claim data under this Additional Coverage in any one occurrence is $5,000 regardless of the number of premises involved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DEBRIS REMOVAL

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.5. Additional Coverages.**

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limit of Insurance.

**Debris Removal**

1. We will pay your expense to remove debris of Covered Property, other than outdoor trees, shrubs, plants and lawns as described in the Outdoor Trees, Shrubs, Plants and Lawns Coverage Extension, caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us within 180 days of the date of direct physical loss or damage

2. Debris Removal does not apply to costs to:

   a. Extract "pollutants" from land or water; or

   b. Remove, restore or replace polluted land or water.

3. Except as provided in Paragraph **4.** below, payment for Debris Removal is included within the applicable Limit of Insurance shown in the Declarations. The most we will pay under this Additional Coverage is 25% of:

   a. The amount we pay for the direct physical loss or damage to Covered Property; plus

   b. The deductible in this Coverage Form applicable to that loss or damage.

4. When the debris removal expense exceeds the 25% limitation in Paragraph **3.** above or when the sum of the debris removal expense and the amount we pay for the direct physical loss of or damage to Covered Property exceeds the applicable Limit of Insurance, we will pay up to an additional $25,000, or the limit shown in the Declarations, for debris removal expense in any one occurrence, at each described premises.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 58 of 83 PageID #: 63



# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYEE DISHONESTY

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.5. Additional Coverages**:

Unless otherwise stated, payments under the following Additional Coverage is in addition to the applicable Limit of Insurance.

**Employee Dishonesty**

1. We will pay for loss of or damage to Business Personal Property resulting directly from "Employee Dishonesty."

   We will pay for loss or damage you sustain through acts committed or events occurring during the Policy Period. Regardless of the number of years this insurance remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period.

2. Paragraphs **A.2.m., A.2.n., A.2.p., B.2.h.** and **B.2.o.** do not apply to this Additional Coverage.

3. We will not pay for loss resulting from the dishonest acts of any "employee" if coverage for that "employee" was either cancelled or excluded from any previous insurance of yours providing "employee dishonesty" coverage.

4. This Additional Coverage is cancelled as to any "employee immediately upon discovery by:

   a. You; or

   b. Any of your partners, "members," "managers," officers, directors or trustees not in collusion with the "employee,"

   of any fraudulent dishonest act committed by that "employee" before or after being employed by you.

5. We will pay for covered loss or damage only if discovered no later than one year from the end of the Policy Period.

6. The most we will pay for loss under this Additional Coverage in any one occurrence is the limit shown on the Declarations regardless of the number of premises involved.

7. With respect to this Additional Coverage, occurrence means all loss or damage caused by or involving the same "employee(s)" whether the result of a single act or series of acts.

8. If, during the period of any prior "Employee Dishonesty" insurance, you (or any predecessor in interest) sustained loss or damage that you could have recovered under that insurance, except that the time within which to discover loss or damage has expired, we will pay for it under this Additional Coverage, subject to the following:

   a. This insurance became effective at the time of cancellation or termination of the prior insurance; and

   b. The loss or damage would have been covered by this insurance had it been in effect when the acts or events causing the loss or damage were committed or occurred.

9. The insurance provide under paragraph **8.** above is part of, not in addition to the Limit of Insurance described in Paragraph **6.** above and is limited to the lesser of the amount recoverable under:

   a. This Additional Coverage, as of its effective date; or

   b. The prior "Employee Dishonesty" insurance, had it remained in effect.

10. We will not pay for loss or damage under this endorsement until the amount of loss or damage in any one occurrence exceeds $250. We will then pay the amount of loss or damage in excess of the $250 up to the Limit of Insurance.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 59 of 83 PageID #: 64

**CNA**

SB-146808-A
(Ed. 01/06)

# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXPEDITING EXPENSES

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.5. Additional Coverages.**

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limits of Insurance.

**Expediting Expenses**

1. In the event of direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss, we will pay for the reasonable and necessary additional expenses you incur to make temporary repairs, expedite permanent repairs, or expedite permanent replacement, at the premises sustaining loss or damage. Expediting expenses include overtime wages and the extra cost of express or other rapid means of transportation. Expediting expenses do not include expenses you incur for the temporary rental of property or temporary replacement of damaged property.

2. With respect to this Additional Coverages, "breakdown" to "covered equipment" will not be considered a Covered Cause of Loss, even if otherwise covered elsewhere in this Policy.

3. The most we will pay under this Additional Coverage in any one occurrence is $25,000, regardless of the number of premises involved.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 60 of 83 PageID #: 65


## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## FINE ARTS

This endorsement modifies insurance provided under the following:

BUSINESS OWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.5.** Additional Coverages.

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limits of Insurance.

**Fine Arts**

1. When a Limit of Insurance is shown in the Declarations for Building or Business Personal Property at any described premises, we will pay for direct physical loss of or damage to "fine arts" which are owned by:

   a. You; or

   b. Others and in your care, custody or control;

   caused by or resulting from a Covered Cause of Loss, including while on exhibit, or in transit, anywhere within the Coverage Territory.

2. The breakage limitation under Paragraph **A.4.b.(2)** does not apply to this Additional Coverage.

3. The following exclusions apply to this Additional Coverage:

   a. We will not pay for loss or damage caused by or resulting from wear and tear, any quality in the property that causes it to damage or destroy itself, gradual deterioration, insects, birds, rodents or other animals;

   b. We will not pay for loss or damage caused by or resulting from dampness or dryness of atmosphere, or changes in extremes of temperature;

   c. We will not pay for loss or damage cause by or resulting from any repairing, restoration or retouching process;

   d. We will not pay for loss or damage cause by or resulting from faulty packing;

   e. Paragraph **B.1.b.** Earth Movement;

   f. Paragraph **B.1.c.** Governmental Action;

   g. Paragraph **B.1.d.** Nuclear Hazard;

   h. Paragraph **B.1.f.** War and Military Action;

   i. Paragraph **B.1.g. (1), (2) and (4)** Water;

   j. Paragraph **B.1.h.** Neglect; and

   k. Paragraph **B.2.g.** Frozen Plumbing

   No other exclusions in Paragraph **B.** Exclusions apply to this Additional Coverage. However, if any exclusions are added by endorsement to this policy, such exclusions will apply to this Additional Coverage.

4. The most we pay for loss or damage under this Additional Coverage in any one occurrence is $25,000, or the amount shown in the Declarations for "fine arts," whichever is greater.

5. This Additional Coverage does not apply to property:

   a. While in the custody of the United States Postal Service;

   b. After delivery to customers.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 61 of 83 PageID #: 66

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## FIRE DEPARTMENT SERVICE CHARGE

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.5.** Additional Coverages.

Unless otherwise stated, payments made under this following Additional Coverage is in addition to the applicable Limit of Insurance.

When the fire department is called to save or protect Covered Property from a Covered Cause of loss, we will pay up to $25,000 for your liability for fire department service charges:

1. Assumed by contract or agreement prior to loss; or

2. Required by local ordinance.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 62 of 83 PageID #: 67



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## FIRE PROTECTIVE EQUIPMENT DISCHARGE

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.5.** Additional Coverages.

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the Applicable Limits of Insurance.

1. If fire protective equipment discharges accidentally or to control a Covered Cause of Loss, we will pay your cost to:

   a. Refill or recharge the system with the extinguishing agents that were discharged; and

   b. Replace or repair faulty valves or controls which caused the discharge.

2. The most we will pay under this Additional Coverage in any one occurrence is $10,000, regardless of the number of premises involved.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 63 of 83 PageID #: 68

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## FORGERY AND ALTERATION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.5.** Additional Coverages.

Unless otherwise stated, payment made under the following Additional Coverage is in addition to the applicable Limits of Insurance.

**Forgery and Alteration**

1. We will pay for loss resulting directly from "forgery" or alteration of, on, or in any check, draft, promissory note, bill of exchange, or similar written promise, order or direction to pay a sum certain money, made or drawn by or drawn upon you, or made or drawn by one acting as an agent or claiming to have been so made or drawn.

   We will consider signatures that are produced or reproduced electronically, mechanically or by facsimile the same as handwritten signatures.

   We will pay for loss that you sustain through acts committed or events occurring during the Policy Period. Regardless of the number of years this insurance remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period.

2. We will not pay for loss resulting from any dishonest or criminal acts committed by your or any of your partners, "employees," "members," "managers," officers, directors or trustees whether acting alone or in collusion with other persons.

3. We will pay for covered loss discovered no later than one year from the end of the Policy Period.

4. The most we will pay for loss under this Additional Coverage in any one occurrence is the limit shown on the Declarations regardless of the number of premises involved.

5. With respect to this Additional Coverage, occurrence means all loss caused by any person, or in which that person is concerned or implicated, either resulting from a single act or any number of such acts, whether the loss involves one or more instruments.

6. If, during the period of any prior Forgery or Alteration insurance, you (or any predecessor in interest) sustained loss or damage that you could have recovered under that insurance, except that the time within which to discover loss or damage has expired, we will pay for it under this Additional Coverage provided:

   a. This insurance became effective at the time of cancellation or termination of the prior insurance; and

   b. The loss would have been covered by this insurance had it been in effect when the acts or events causing the loss were committed or occurred.

7. The insurance provided under Paragraph **6.** above is part of, and not in addition to the limit described in Paragraph **4.** above and is limited to the lesser of the amount recoverable under:

   a. This Additional Coverage up to the applicable Limit of Insurance under this Policy, as of its effective date; or

   b. The prior Forgery or Alteration insurance, had it remained in effect.

8. If you are sued for refusing to pay any covered instrument described in Paragraph **1.** above on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay any reasonable legal expenses that you incur and pay in that defense. The amount we pay for these legal expenses will be part of and not in addition to the limit described in Paragraph **4.** above.

9. The following definition is added:

   **"Forgery"** means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity for any purpose.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 64 of 83 PageID #: 69



SB-146813-B
(Ed. 01/08)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEWLY ACQUIRED OR CONSTRUCTED PROPERTY

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.5.** Additional Coverages.

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limits of Insurance.

Newly Acquired or Constructed Property

1. **Buildings**

   a. We will pay for direct physical loss of or damage to the following property caused by or resulting from a Covered Cause of Loss:

      (1) Your:

         (a) New buildings while being built on a premises shown in the Declarations;

         (b) New buildings while being built on newly acquired premises; and

            (i) intended for similar use as a building described in the Declarations; or

            (ii) used as a warehouse

         (c) Materials, equipment, supplies and temporary structures used in connection with such buildings while they are being built; or

      (2) Buildings you acquire by purchase or lease at any premises, including those premises shown in the Declarations.

   b. The most we will pay for loss of or damage to newly constructed buildings or newly acquired buildings under this Additional Coverage in any one occurrence is $1,000,000 at each premises.

2. **Business Personal Property**

   a. When a Limit of Insurance is shown in the Declarations for Business Personal Property at any described premises, we will pay for direct physical loss of or damage to the following property caused by or resulting from a Covered Cause of Loss:

      (1) Business Personal Property, including such property that you newly acquire, at a building you acquire by purchase or lease at any premises, including those premises shown in the Declarations; and

      (2) Business Personal Property that you newly acquire at a described premises.

   b. The most we will pay for loss of or damage to Business Personal Property under this Additional Coverage in any once occurrence is $250,000 at each premises.

3. **Period of Coverage**

   a. With respect to insurance under this Additional Coverage, coverage will end when any of the following first occurs:

      (1) This policy expires;

      (2) 180 days expire after you acquire the property or begin to construct the property;

      (3) You report values to us; or

      (4) The property is more specifically insured.

   b. We will charge you additional premium for values reported to us from the date construction begins or you acquire the property.

SB-146813-B
(Ed. 01/08)

Page 1 of 1

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 65 of 83 PageID #: 70



## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ORDINANCE OR LAW

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Section **A.5. Additional Coverages.**

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limits of Insurance.

1. In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay for:

   a. Loss in value of the undamaged portion of the building as a consequence of enforcement of the minimum requirements of any ordinance or law that requires the demolition of undamaged parts of the same building;

   b. Demolition cost, meaning the cost to demolish and clear the site of undamaged parts of the same building as a consequence of enforcement of the minimum requirements of any ordinance or law that required demolition of such undamaged property; and

   c. The increased cost of construction, meaning the increased cost to repair, rebuild or reconstruct the property as a consequence of enforcement of the minimum requirements of any ordinance or law. This increased cost of construction coverage applies only if:

      (1) The building is insured for replacement cost;

      (2) The building is repaired, rebuilt or reconstructed; and

      (3) The repaired, rebuilt or reconstructed building is intended for similar occupancy as the current building, unless otherwise required by zoning or land use ordinance or law.

2. The ordinance or law referred to in this Additional Coverage is an ordinance or law that:

   a. Regulates the demolition, construction or repair of buildings, or establishes zoning or land use requirements at the described premises; and

   b. Is in force at the time of the loss.

3. We will not pay under this Additional Coverage for:

   a. Loss due to any ordinance or law that:

      (1) You were required to comply with before the loss, even if the building was undamaged; and

      (2) You failed to comply with; or

   b. Costs associated with the enforcement of any ordinance or law that requires any insured or other to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants."

4. Paragraph **B.1.a.** does not apply to this Additional Coverage.

5. Subject to the limit described in Paragraph **6.** below:

   a. The insurance provided under this Additional Coverage for loss in value to the undamaged portion of the building is limited as follows:

      (1) If Replacement Cost Coverage applies and the building is repaired or replaced on the same or another premises, we will not pay more than the lesser of:

         (a) The amount you actually spend to repair, rebuild or reconstruct the undamaged portion of the building; or

         (b) The amount it would cost to restore the undamaged portion of the building on the same premises and to the same height, floor area, style and comparable quality of the original undamaged portion of the building; or

      (2) If Replacement Cost Coverage applies and the building is not repaired or replaced, or if Replacement Cost Coverage does not apply, we will not pay more than the actual cash value of the undamaged portion of the building at the time of loss.

   b. We will not pay more for demolition costs than the amount you actually spend to demolish and clear the site of the described premises.

   c. The insurance provided under this Additional Coverage for increased cost of construction is limited as follows:

      (1) If the building is repaired or replaced at the same premises, or if you elect to

Case 3:13-cv-00241  Document 1-1  Filed 03/18/13  Page 66 of 83 PageID #: 71

rebuild at another premises, the most we will pay is the increased cost of construction at the same premises; or

**(2)** If the ordinance or law requires relocation to another premises, the most we will pay is the increased cost of construction at the new premises.

**6.** The most we will pay for loss under this Additional Coverage for the total of all coverages described in:

**a.** Paragraph **1.a.** above in any one occurrence is the Building Limit at each described premises shown in the Declarations, if this coverage has been selected and is indicated on the Declarations.

**b.** Paragraph **1.b. and 1.c.** above in any one occurrence is $25,000 or the limit shown in the Declarations, whichever is greater at each described premises.

**CNA**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## OUTDOOR TREES, SHRUBS, PLANTS AND LAWNS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Section **A.5.** Additional Coverages.

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limits of Insurance.

**Outdoor Trees, Shrubs, Plants and Lawns**

1. We will pay for direct physical loss of or damage to outdoor trees, shrubs, plants (other than "stock" of trees, shrubs or plants) and lawns located at the described premises caused by or resulting from a Covered Cause of Loss.

2. The most we will pay for loss or damage under this Additional Coverage in any one occurrence is $3,000 at each described premises.

3. Debris removal, because of covered loss or damage to outdoor trees, shrubs, plants and lawns, is included within the limits described in Paragraph **2.** above.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 68 of 83 PageID #: 73



# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## POLLUTANT CLEAN UP AND REMOVAL

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Property Coverage Form under Paragraph **A.5.** Additional Coverages.

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limits of Insurance.

**Pollutant Clean Up and Removal**

1. We will pay your necessary and reasonable expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from "specified causes of loss" that occurs:

   **a.** On the described premises;

   **b.** To Covered Property; and

   **c.** During the policy period.

2. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the "specified cause of loss" occurs.

3. This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants." But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

4. The most we will pay under this Additional Coverage is $25,000 for the sum of all covered expenses arising out of all Covered Causes of Loss occurring during each separate 12 month period of this policy beginning with the effective date of this policy. This amount applies regardless of the number of premises involved.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 69 of 83 PageID #: 74

CNA

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PRESERVATION OF PROPERTY

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.5. Additional Coverages.**

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limits of Insurance.

**Preservation of Property**

1.  If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for:

    a.  Any direct physical loss or damage to this property:

        (1) While it is being moved; or

        (2) Temporarily stored at another location only if the loss or damage occurs within 90 days after the property is first moved; and

    b.  The costs incurred to:

        (1) Remove such property from the described premises; and

        (2) Return such property to the described premises.

2.  Coverage under this Additional Coverage will end when any of the following first occurs:

    a.  When the policy is amended to provide insurance at the new location;

    b.  The property is returned to the original described premises;

    c.  90 days expire after the property is first moved; or

    d.  This policy expires.

3.  Payments under this Additional Coverage are subject to and not in addition to the applicable Limit of Insurance.



## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## TEMPORARY RELOCATION OF PROPERTY

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.5.** Additional Coverages.

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limits of Insurance.

**Temporary Relocation of Property**

1. If Covered Property is removed from the described premises and stored temporarily at a location you own, lease or operate while the described premises is being renovated or remodeled, we will pay for loss or damage to that stored property:

   **a.** Caused by or resulting from a Covered Cause of Loss;

   **b.** Up to $50,000 at each temporary location; and

   **c.** During the storage period of up to 90 consecutive days but not beyond expiration of this policy.

2. This Additional Coverage does not apply if the stored property is more specifically insured.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 71 of 83 PageID #: 76

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## WATER DAMAGE, OTHER LIQUIDS, SOLDER OR MOLTEN MATERIAL DAMAGE

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.5. Additional Coverages.**

Unless otherwise stated, payments made under the following Additional Coverage is in addition to the applicable Limits of Insurance.

**Water Damage, Other Liquids, Solder or Molten Material Damage**

1. If loss or damage caused by or resulting from covered water or other liquid, solder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

2. We will not pay the cost to repair any defect to a system or appliance from which the water, other liquid, solder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage:

   **a.** Results in discharge of any substance from an automatic fire protection system; or

   **b.** Is directly caused by freezing.

3. Payments made under this Additional Coverage are subject to and not in addition to the applicable Limit of Insurance.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 72 of 83 PageID #: 77


## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ACCOUNTS RECEIVABLE

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6. Coverage Extensions.**

Unless otherwise stated, payments made under the following Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

**Accounts Receivable**

1. When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises, you may extend that insurance to apply to loss, as described in Paragraph **2.** below, due to direct physical loss of or damage to your records of accounts receivable (including those on electronic data processing media) caused by or resulting from a Covered Cause of Loss. Credit card company media will be considered accounts receivable until delivered to the credit card company.

2. We will pay for:

   a. All amounts due from your customers that you were unable to collect;

   b. Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

   c. Collection expenses in excess of your normal collection expenses that are made necessary by the loss or damage; and

   d. Other reasonable expenses that you incur to re-establish your records of accounts receivable.

3. The following exclusions apply to this Coverage Extension:

   a. We will not pay for loss caused by or resulting from bookkeeping, accounting or billing errors or omissions;

   b. We will not pay for loss that requires an audit of records or any inventory computation to prove its factual existence;

   c. We will not pay for loss caused by or resulting from alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of money, securities or other property. But this exclusion applies only to the extent of wrongful giving, taking or withholding;

   d. Paragraph **B.1.b.** Earth Movement;

   e. Paragraph **B.1.c.** Governmental Action;

   f. Paragraph **B.1.d.** Nuclear Hazard;

   g. Paragraph **B.1.f.** War and Military Action;

   h. Paragraph **B.1.g. (1), (2), and (4)** Water;

   i. Paragraph **B.1.h.** Neglect; and

   j. Paragraph **B.2.j.** False Pretense;

   No other exclusions in Paragraph **B. Exclusions** apply to this Coverage Extension. However, if any exclusions are added by endorsement to this Policy, such exclusions will apply to this Coverage Extension.

4. The most we will pay under this Coverage Extension for loss of or damage to records of accounts receivable in any one occurrence while in transit or at a premises other than the described premises is $25,000.

5. The most we will pay under this Coverage Extension for loss of or damage to records of accounts receivable in any one occurrence at each described premises is $25,000 or the amount shown in the Declarations for Accounts Receivable, whichever is greater.

6. Payments made under this Coverage Extension are in addition to the applicable Limits of Insurance.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 73 of 83 PageID #: 78

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## APPURTENANT BUILDINGS AND STRUCTURES

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions.

Unless otherwise stated, payments made under the following Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

**Appurtenant Buildings and Structures**

1. When a Limit of Insurance is shown in the Declarations for Building at the described premises, you may extend that insurance to apply to direct physical loss of or damage to incidental appurtenant buildings or structures, within 1,000 feet of that described premises, caused by or resulting from a Covered Cause of Loss.

2. When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises, you may extend that insurance to apply to direct physical loss of or damage to Business Personal Property within incidental appurtenant buildings or structures within 1,000 feet of that described premises, caused by or resulting from a Covered Cause of Loss.

3. Incidental appurtenant buildings or structures include:

   **a.** Storage buildings;

   **b.** Carports;

   **c.** Garages;

   **d.** Pump houses; or

   **e.** Above ground tanks;

   Which have not been specifically described in the Declarations.

4. The most we will pay for loss or damage under this Coverage Extension in any one occurrence for any combination of loss of or damage to Building and Business Personal Property is $50,000, regardless of the number of described premises involved.

5. Payments made under this Coverage Extension are in addition to the applicable Limits of Insurance.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 74 of 83 PageID #: 79



## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## BUILDING GLASS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions.

Unless otherwise stated, payments made under the following Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

**Building Glass**

1. **If:**

   a. You are the building owner; and

   b. A Limit of Insurance is shown in the Declarations for Building at the described premises;

   you may extend that insurance to apply to direct physical loss of or damage to all exterior and interior building glass caused by or resulting from a Covered Cause of Loss, including glass breakage and damage to glass by chemicals accidentally or maliciously applied to glass. If a specific deductible has been selected for building glass as shown on the Declarations we will apply that deductible to any covered loss. If no deductible is selected for building glass, the policy deductible will be applied to covered building glass losses.

2. **If:**

   a. You are a tenant;

   b. A Limit of Insurance shown in the Declarations for Building or Business Personal Property at the described premises; and

   c. You are contractually obligated to repair or replace building glass at the described premises;

   you may extend that insurance to apply to direct physical loss of or damage to all exterior and interior building glass caused by or resulting from a Covered Cause of Loss, including glass

breakage and damage to glass by chemicals accidentally or maliciously applied to glass. If a specific deductible has been selected for building glass as shown on the Declarations we will apply that deductible to any covered loss. If no deductible is selected for building glass, the policy deductible will be applied to covered building glass losses.

3. We will also pay for necessary expenses in connection with loss or damage covered in Paragraphs **1.** or **2.** above, incurred by you to:

   a. Put up temporary plates or board up openings;

   b. Repair or replace encasing frames; and

   c. Remove or replace obstructions.

4. The following exclusions apply to this Coverage Extension:

   a. We will not pay for loss or damage caused by or resulting from:

      (1) Wear and tear;

      (2) Hidden or latent defect;

      (3) Corrosion; or

      (4) Rust;

   b. Paragraph **B.1.b.** Earth Movement;

   c. Paragraph **B.1.c.** Governmental Action;

   d. Paragraph **B.1.d.** Nuclear Hazard;

   e. Paragraph **B.1.f.** War and Military Action; and

   f. Paragraph **B.1.g.** Water.

No other exclusions in Paragraph **B.** Exclusions apply to this Coverage Extension. However, if any exclusions are added by endorsement to this Policy, such exclusions will apply to this Coverage Extension.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 75 of 83 PageID #: 80



## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## BUSINESS PERSONAL PROPERTY OFF PREMISES

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions.

Unless otherwise stated, payments made under the following Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

**Business Personal Property Off Premises**

1. When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises, you may extend that insurance to apply to direct physical loss of or damage to such property caused by or resulting from a Covered Cause of Loss while:

   **a.** In the course of transit to or from the described premises; or

   **b.** Temporarily away from the described premises and:

      **(1)** At a premises you do not own, lease or operate; or

      **(2)** At any fair, trade show or exhibition at a premises you do not own or regularly occupy.

2. This Coverage Extension does not apply to property:

   **a.** While in the custody of the United States Postal Service;

   **b.** Rented or leased to others;

   **c.** After delivery to customers;

   **d.** Temporarily at a premises for more than 60 consecutive days, except "money" and "securities" at a "banking premises";

   **e.** Otherwise covered under the Fine Arts Additional Coverage; or

   **f.** Otherwise covered under the following Coverage Extensions:

      **(1)** Accounts Receivable;

      **(2)** Electronic Data Processing;

      **(3)** Personal Effects; or

      **(4)** Valuable Papers and Records.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 76 of 83 PageID #: 81



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CIVIL AUTHORITY

This endorsement modifies insurance provided under the following:

BUSINESS INCOME AND EXTRA EXPENSE COVERAGE FORM
BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions.

Unless otherwise stated, payments made under the following Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

**Civil Authority**

1.  When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur caused by action of civil authority that prohibits access to the described premises. The civil authority action must be due to direct physical loss of or damage to property at locations, other than described premises, caused by or resulting from a Covered Cause of Loss.

2.  The coverage for Business Income will begin 24 hours after the time of that action and will apply for a period of four consecutive weeks after coverage begins.

3.  The coverage for Extra Expense will begin immediately after the time of that action and will end when your Business Income coverages ends for this Coverage Extension.



## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ELECTRONIC DATA PROCESSING EQUIPMENT AND ELECTRONIC MEDIA AND DATA
# (EDP COVERAGE FORM)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extension:

**Electronic Data Processing**

1. When a Limit of Insurance is shown in the Declarations for Electronic Data Processing at the described premises, that insurance applies to:

   **a.** Direct physical loss of or damage to your "electronic data processing equipment" caused by or resulting from a Covered Cause of Loss; and

   **b.** Direct physical loss of or damage to your "electronic media and data" caused by or resulting from a Covered Cause of Loss.

2. Worldwide coverage is provided under this Coverage Extension. The coverage territory as described in Paragraph **F.8.b** does not apply to this Coverage Extension.

3. This Coverage Extension does not apply to:

   **a.** "Stock"; or

   **b.** Property that is leased or rented to others.

4. The following exclusions as described in Section **B.,** Exclusions, of the Businessowners Special Property Coverage Form do not apply to the Insuring Agreement set forth in Paragraph **1.a.** or **1.b.** of this Coverage Extension:

   **a.** Paragraph **1.e.;** and

   **b.** Paragraph **1.g.(3);** and

   **c.** Paragraph **2.a.**

   The following exclusion as described in Section **B.,** Exclusions, of the Businessowners Special Property Coverage Form does not apply to the Insuring Agreement set forth in Paragraph **1.a.** of this Coverage Extension: **Paragraph 2.d.(6).**

5. The following additional exclusions apply:

   With respect to this Coverage Extension, we will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:

   **a.** Programming errors or omissions, or incorrect instructions to a machine, including without limitation, incorrect instructions to "electronic data processing equipment" from a user incorrectly operating with, or committing an error using an input device (including, without limitation, a keyboard, mouse or touchpad) and corrupting, distorting, deleting, damaging or destroying "electronic data"; provided, however, that this exclusion shall not apply to an otherwise covered mechanical breakdown of "electronic data processing equipment" under the Insuring Agreement set forth in Paragraph **1.a.** of this Coverage Extension.

   **b.** Unauthorized viewing, copying or use of "Electronic Media and Data" or "Electronic Data" (or any proprietary or confidential information or intellectual property) by any person, even if such activity is characterized as "theft."

   **c.** Errors or deficiency in design, installation, maintenance, repair or modification of your "electronic data processing equipment," "electronic media and data" or "electronic data" or any "electronic data processing equipment," electronic devices, computer system or network to which your "electronic data processing equipment" "electronic media and data" or "electronic data" is connected or dependent; provided, however, that this exclusion shall not apply to an otherwise covered mechanical breakdown of "electronic data processing equipment" under the Insuring Agreement set forth in Paragraph 1.a. of this Coverage Extension.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 78 of 83 PageID #: 83

d. Unexplained or indeterminable failure, malfunction or slowdown of a "electronic data processing equipment" "electronic media and data" or "electronic data."

6. The most we will pay under this Coverage Extension for all direct physical loss of or damage to "electronic data processing equipment" and "electronic media and data" (combined) in any one occurrence while in transit or at a premises other than the described premises is $25,000.

7. The most we will pay under this Coverage Extension for loss of or damage to "Electronic Media and Data" while stored at a separate premises from where your original "Electronic Media and Data" are kept, in any one occurrence, is $25,000.

8. The most we will pay under this Coverage Extension for all direct physical loss or damage to "electronic data processing equipment" and "electronic media and data" (combined) you acquire after the inception date of the policy in any one occurrence is $25,000.

Provided, however, with respect to insurance coverage under this Coverage Extension on any such newly acquired "electronic data processing equipment" or "electronic media and data," coverage will end on the date and time that any of the following first occurs:

a. This policy expires;

b. 180 days after you acquire the "electronic data processing equipment" or "electronic media and data"; or

c. You report values to us.

9. The most we will pay under this Coverage Extension for all direct physical loss of or damage to "electronic data processing equipment" and "electronic media and data" (combined) at the described premises in any one occurrence is the Limit of Insurance shown in the Declarations or $50,000, whichever is greater.

10. Payments made under this Coverage Extension are in addition to the applicable Limits of Insurance.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 79 of 83 PageID #: 84



## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EQUIPMENT BREAKDOWN

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions.

Unless otherwise stated, payments made under the following Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

**Equipment Breakdown**

1. When a Limit of Insurance is shown in the Declarations for Equipment Breakdown, at the described premises, the limit applies to direct physical loss of or damage to Covered Property at the described premises caused by or resulting from a "breakdown" to "covered equipment."

   With respect to otherwise covered Business Income and Extra Expense, "breakdown" to "covered equipment" will be considered a Covered Cause of Loss.

   If an initial "breakdown" causes other "breakdowns," all will be considered one "breakdown." All "breakdowns" that manifest themselves at the same time and are the result of the same cause will also be considered; one "breakdown."

2. Under this Coverage Extension, the following coverages also apply:

   a. Expediting Expenses

      (1) In the event of direct physical loss of or damage to Covered Property caused by or resulting form a "breakdown" to "covered equipment," we will pay for the reasonable additional expenses you necessarily incur to make temporary repairs to, or expedite the permanent repair or replacement of, the lost or damaged Covered Property.

      (2) Expediting expenses include overtime wages and the extra cost of express or other rapid means of transportation.

      (3) The most we will pay under this Coverage Extension for all Expediting Expenses arising out of any one "breakdown" is $25,000. This limit is part of and not in addition to the Limit of Insurance that applies to lost or damage Covered Property.

   b. "Pollutants"

      (1) In the event of direct physical loss of or damage to Covered Property caused by or resulting form a "breakdown" to "covered equipment," we will pay for the additional cost to repair or replace Covered Property because of contamination by "pollutants." This includes the additional expenses to clean up or dispose of such property. Additional costs mean those beyond what would have been required had no "pollutants" been involved.

      (2) The most we will pay under this Coverage Extension for loss or damage to Covered Property caused by contamination by "pollutants" arising out of any one "breakdown" is $25,000. This limit is subject to and not in addition to the Limit of Insurance that applies to lost or damaged Covered Property.

   c. Service Interruption

      When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to loss caused by or resulting from a "breakdown" to equipment that is owned, operated or controlled by a local public or private utility or distributor that directly generates, transmits, distributes or provides the following utility services:

      (1) "Water Supply Services";

      (2) "Communication Supply Services"; or

      (3) "Power Supply Services."

3. We will not pay under this Coverage Extension for loss or damage caused by or resulting from any of the following tests:

   a. A hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel; or

   b. An insulation breakdown test of any type of electrical equipment.

4. We will not pay under this Coverage Extension for loss or damage caused by or resulting from a change in:

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 80 of 83 PageID #: 85

a. Temperature; or

b. Humidity;

as a consequence of "breakdown" to "covered equipment."

5. The following limitations in Paragraph **A.4.** do not apply to this Coverage Extension:

   a. Paragraph a.(2); and

   b. Paragraph a.(3).

6. The following exclusions in Paragraph B. Exclusions do not apply to this Coverage Extension:

   a. Paragraph 2.a.;

   b. Paragraph 2.d.(6); and

   c. Paragraph 2.e.

7. With respect to this Coverage Extension, the following condition is added to Paragraph F. Commercial Property Conditions:

   **Suspension**

   If any "covered equipment" is found to be in or exposed to a dangerous condition, any of our representatives may immediately suspend the insurance provided by this Coverage Form for loss or damage caused by or resulting from a "breakdown" to that "covered equipment." This can be done by delivering or mailing a notice of suspension to:

   a. Your last known address; or

   b. The address where the "covered equipment" is located.

   Once suspended in this way, such insurance can only be reinstated by a written endorsement issued by us. If we suspend your insurance, you will get a pro rata refund of premium for that "covered equipment." But the suspension will be effective even if we have not yet made or offered a refund.

8. The most we will pay under this Coverage Extension for all direct physical loss of or damage to:

   a. "Diagnostic Equipment";

   b. "Power Generating Equipment"; or

   c. "Production Equipment";

   caused by or resulting from a "breakdown" to "covered equipment" in any one occurrence is $100,000.

9. The following Loss Payment Condition is added under **E.4.a. Loss Payment Building and Personal Property** of the Businessowners Special Property Coverage Form:

   **(19)** "Covered Equipment" as follows:

   > If Equipment Breakdown Property requires replacement due to an Equipment Breakdown Accident, we will pay your additional cost to replace it with equipment that is better for the environment, safer or more efficient than the equipment being replaced. However, we will not pay more than 125% of what the cost would have been to repair or replace with property of comparable material and quality. This coverage does not increase any of the applicable limits. This coverage does not apply to any property indicated as being valued on an Actual Cash Value basis.

   > If you wish to retrofit air conditioning or refrigeration equipment that utilizes a refrigerant containing CFC (chlorofluorocarbon) substances to accept a non-CFC refrigerant, we will consider this better for the environment. Any associated Business Income or Extra Expense will be included, in determining the additional cost, if Business Income and Extra Expense apply to this policy.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 81 of 83 PageID #: 86

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## MONEY ORDERS AND COUNTERFEIT PAPER CURRENCY

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6.** Coverage Extensions:

Unless otherwise stated, payments made under this Coverage Extension are subject to and not in addition to the applicable Limits of Insurance.

When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises, you may extend that insurance to apply to loss due to the good faith acceptance of:

**1.** Any U.S. or Canadian post office or express money order, issued or claiming to have been issued by any post office or express company, if the money order is not paid upon presentation; or

**2.** Counterfeit United States or Canadian paper currency.

in exchange for merchandise, "money" or services or as part of a normal business transaction.

Case 3:13-cv-00241   Document 1-1   Filed 03/18/13   Page 82 of 83 PageID #: 87



# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NON-OWNED DETACHED TRAILERS

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM

The following coverage is added to your Businessowners Special Property Coverage Form under Paragraph **A.6. Coverage Extensions.**

Unless otherwise stated, payments made under the following Coverage Extension is subject to and not in addition to the applicable Limits of Insurance.

1. When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises you may extend the insurance that applies to your Business Personal Property to apply to loss or damage to trailers or semi-trailers that you do not own, provided that:

   a. The trailer is used in your business;

   b. The trailer is in your care, custody or control at the premises described in the Declarations; and

   c. You have a contractual responsibility to pay for loss or damage to the trailer.

2. We will not pay for any loss or damage that occurs:

   a. While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion;

   b. During hitching or unhitching operations, or when a trailer becomes accidentally unhitched from a motor vehicle or motorized conveyance.

3. The most we will pay for loss or damage under this Coverage Extension in any one occurrence is $5,000 regardless of the number of described premises, trailers or semi-trailers involved.

4. This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.